[No. 5501.   Decided April 12, 1905.]

C. F. ADAMS, SECOND, *Respondent,* v. WASHINGTON BRICK, LIME AND MANUFACTURING COMPANY, *Appellant.*[1]

APPEAL—EXCEPTIONS—NECESSITY OF—REVIEW—FINDINGS NOT JUSTIFYING DECREE. It is unnecessary to except to the conclusions of law or the findings, where the appellant's contention is that the findings of fact do not justify the judgment or decree.

CONTRACTS—CONSTRUCTION—AGREEMENT FOR ROYALTY ON CLAY —LEASE—FIVE YEAR PERIOD—TERMINATION—EXHAUSTION OF CLAY BEFORE EXPIRATION OF TERM. An agreement in the form of a lease of land containing clay suitable for brick making, whereby the owner lets the premises for the term of five years, in consideration of a certain royalty on the brick manufactured by the lessee from clay taken from the land, and providing that the royalty shall not be less than $200 each year, which is agreed to be paid in any event, presupposes the existence of sufficient clay for operations throughout the five-year term, .and is terminated upon exhausting the clay; since brick making was not a mere incident to the contract, which was more than a mere lease, especially in view of a provision that the premises should not be used for any other purpose.

· Appeal from a judgment of the superior court for Spokane county, Belt J., entered May 16, 1904, upon findings in favor of the plaintiff, after a trial on the merits before the court, a jury being waived, in an action on contract. Reversed.

1Reported in 80 Pac. 446.

*Hamblen, Lund & Gilbert,* for appellant.

*Post, Avery & Higgins,* for respondent, cited: *Scioto Fire Brick Co. v. Pond,* 38 Ohio St. 65; 18 Am. & Eng. Ency. Law, 261; *Timlin v. Brown,* 158 Pa. St. 606, 28 Atl. 236; *Bamford v. Lehigh Zinc & Iron Co.,* 33 Fed. 677; *Id.,* 150 U. S. 665, 14 Sup. Ct. 219, 37 L. Ed. 1215; *Raynolds v. Hanna,* 55 Fed. 783; *Consolidated Coal Co. v. Peers,* 150 Ill. 344, 37 N. E. 937.

Root, J.—In this case respondent interposes a motion to dismiss the appeal and affirm the judgment, for the reason that the conclusions of law are not excepted to, and that none of the findings of fact are excepted to save one which has to do with a matter deemed immaterial. This court has held, in the case of *Woodhurst v. Cramer,* 29 Wash. 40, 69 Pac. 501, that it is unnecessary to except to conclusions of law, where the appellant's contention is that the findings of fact do not justify the judgment or decree. The motion to dismiss and affirm will therefore be denied.

One George C. Adams was the owner of a tract of land containing a quantity of clay suitable for the manufacture of brick. Appellant, desiring to engage in that business, entered into a contract with said Adams for the possession of said premises, for the purpose of converting said clay into brick, for the period of five years. The portions of said contract which we conceive to be involved herein were as follows:

"That said party of the first part, for and in consideration of the rents, covenants and agreements hereinafter mentioned on the part of the party of the second part to be paid, kept and performed, does by these presents grant, demise and let unto the said party of the second part, the following described property, . . . To Have and to Hold the said premises unto the said party of the second

part from the first day of January, 1898, for and during
the full term of five years then next ensuing, and fully to
be completed and ended, yielding and paying therefor unto
the said party of the first part, his heirs and assigns, month-
ly and every month upon the first .day of each and every
month during said term, the rental hereinafter provided.
.  .  .    and the said party of the second part, for itself
and its successors and assigns, does hereby covenant and
agree to and with the said party of the first part, his heirs
or assigns, that the said party of the second part, its succes-
sors and assigns, shall and will, as rental for said premises,
well and truly pay, or cause to be paid, unto the said
party of the first part, his heirs or assigns, a royalty on
all brick manufactured from clay taken from the land
herein described, at the rate of twenty-five cents for each
and every thousand. of brick manufactured prior to the
first day of January, 1899, and at the rate of fifteen cents
per thousand for each and every thousand of brick manu-
factured after the first day of January, 1899, during the
term of this lease;  .  .  .    and that said party of the
first part, his heirs or assigns, or any agent appointed by
him or them, shall have the right at any and all times to
examine any and all books of accounts kept by said party
of the second part, its successors or assigns, for the purpose
of ascertaining the amount of brick sold by said second
party, its successors or assigns, out of brick so manufac-
tured; and said party of the second part, for itself, its
successors and assigns, further covenants and agrees to and
with said party of the first part, his heirs or assigns, that
it, or they, will not assign this lease, nor let or sublet the
said premises, *or use the same for any other purpose* than
that of a general brick business,  .  .  .    Said party of
the second part further covenants to and with said party of
the first part, that the royalty herein provided for, paid
during each year of the term of this lease, shall be not less
than the sum of two hundred dollars, and that if the royal-
ty on the brick sold, during any one or more of said years
shall be less than said sum of two hundred dollars, that
said party of the second part, its successors or assigns, shall
at once pay the difference between the royalty paid dur-

ing the preceding year and said sum of two hundred dollars. In other words, that if it shall appear on January first, 1899, that the royalty on brick sold during the preceding year shall not amount to two hundred dollars, that the difference between said royalty and two hundred dollars shall be promptly paid by said second party, its successors or assigns, to said first party, on January first, 1899, irrespective of, and in addition to all the royalties provided by this lease, and if it shall likewise appear on January first, 1900, that the royalty on the brick sold during the preceding year shall not amount to two hundred dollars, that the difference shall be made up on that day, and so on for each year thereafter; . . ."

Two years prior to the expiration of the five years, the clay upon these premises became exhausted. Appellant immediately notified respondent, who had in the meantime succeeded to the interest of G. C. Adams in said premises, and thereupon abandoned the premises and decline to pay any further rent or royalty. After the expiration of the five years, respondent brought this action to recover $200 for each of the last two years, basing his right of action upon the condition of the contract providing that the royalty should not be less than $200 in any one year, and that, if less, the difference between such royalty and $200 should be paid by appellant to respondent. Appellant contended in the lower court, and contends here, that the contract was terminated when the clay became exhausted; that said clay was the subject-matter of the contract, and not merely an inducement to the making of the same. Respondent contended, and contends here, that this contract is a lease of the premises, and that the existence of the clay and the provision for the manufacture of brick were but incidents and matters of inducement. It will be readily seen that the decision of the issues presented calls for an interpretation of the instrument in question. The intention of the

parties at the time of the execution of this instrument, if ascertainable, must, of course, control. In construing the language of a written contract, that construction should be accorded which is most in consonance with the paramount purpose of the parties at the time of executing the same. It will be assumed that the parties had a purpose in entering into the contract. If the language is susceptible of two or more constructions, it should be given that which would best adapt the agreement to facilitate the accomplishment of the ends evidently sought to be attained. With these principles in mind, let us indulge in analysis.

First, let us ask what was the principal, impelling purpose of these parties in entering into this agreement. Why was it done? We think it may be conceded that each entered into it as a means to "make money." It was a business proposition. Each thought he saw a profit to come to him as a result of the execution and carrying out of this contract. But what was there about the property, circumstances, or conditions that made these parties so think? Was there any peculiar or unusual fact, circumstance, or condition of things that actuated them in making this agreement? There can be no doubt of this. It was the existence of the clay on the premises. The presence of this clay suggested to these parties the possibility of profit through the medium of its manufacture into brick. The "lease" was a contract affording an authorization under which this clay could be made into brick, sold, and the desired profit attained. It is inconceivable that this "lease" would ever have been executed had it not been for the presence of this clay. That it was made for a period of five years shows that the parties assumed the quantity of clay to be sufficient to last during that period. In this they were mistaken. The

clay, which was the basic principle of this undertaking—
the *sine qua non*—having become exhausted, the prime and
controlling cause of the contract's existence was at an end.
That which brought it into, and maintained, its life was
exhausted. The profits derivable from converting the clay
into brick, which constituted the controlling purpose of
these parties in executing the contract, became further
unattainable. The business contemplated by these parties
under this lease became thenceforth impossible, by reason
of something which neither foresaw or anticipated—by
a change that neither expected in a condition which, in
entering upon the contract, both assumed would continue
throughout the five-year term. That which was the essence
—the subject-matter—of their contract became nonexist-
ent.

But respondent urges that the lease provided for an
annual rental of $200 whether any brick were made or
not, and that the cause for the suspension of brickmaking
has nothing to do with the matter—that the said contract
is in form and reality a lease at a definite annual rental
reserved, which amount was subject to increase propor-
tionate to the amount of brick manufactured. In other
words, that the transaction amounted to a lease of the
property, that the presence of clay was but an inducement,
and that the brickmaking was only an incident to the
lease and possession thereunder. Appellant maintains
that the brickmaking was the principal thing in mind,
and that the instrument is merely a lease in form, and that
the provision for a minimum royalty of $200 annually was
inserted, not for the purpose of making the instrument a
lease merely, but to induce appellant to keep at work and
avoid idleness which would shut off respondent's income
from the business.

The latter contention seems to us the more reasonable.

It was the existence of the clay that occasioned the making of this lease or contract. The possibilities based upon the assumed extensive existence of said clay prompted these parties to enter into this agreement. The contract was drawn upon the assumption that the clay would last five years. It did not. When it became exhausted, the essence of the entire transaction was gone. That upon which they had planned their operations vanished. The essential, indispensable item was no longer attainable. The foundation of their undertaking was gone. That which was the paramount consideration of the contract failed. While the instrument is a lease in outline, yet its provisions show that brickmaking, instead of being a mere incident, was the prominent purpose contemplated. It will be noticed that it is expressly provided that the premises *shall not be used for any other purpose.* How a certain purpose can be considered a mere incident in a lease, when the use of the premises is expressly confined to that one purpose, is somewhat difficult to comprehend. It will be noticed that the rental reserved is referred to throughout the lease as "royalty." This is so even in that paragraph where the annual minimum of $200 is provided for. Whether the term "royalty" be regarded as synonymous with "rental," or otherwise, we cannot escape the conviction that the use of the term as employed in this "lease" shows that the prevailing thought of these parties, at that time, was of the manufacture and sale of brick and the profits to accrue therefrom. This impression is deepened by the fact that provision is made for the making of monthly reports to the lessor by the lessee, and for examination by the former of the latter's books and accounts.

Respondent contends that this case is different from one where the land owner sells or leases clay or mineral, and gives a license for its removal—practically conceding that

in such a case the exhaustion of the clay or mineral would terminate the lease or contract. This appears like "a distinction without a difference." As the lease in question restricted appellant to the brick business solely, its effect was substantially the same as if appellant had bought the clay at a given price per ton, or per thousand bricks, together with the privilege of going upon the premises to manufacture the clay into brick. Instead of this being an instrument giving appellant an unlimited right of possession of said premises, with the privilege, express or implied, of using the same for any legitimate purposes, to be surrendered intact at the termination of the lease, we find here an instrument giving possession for one purpose only, and that, a purpose involving the use and disposition of a certain portion of the earth of said premises for commercial purposes. It would seem that this must be deemed something other than an ordinary lease.

Respondent has cited some authorities which tend to support his contention. The facts in the cases cited, however, were more or less different from those in the case at bar. We will call attention to a few cases announcing principles which we believe are controlling here. In the case of *Boyer v. Fulmer,* 176 Pa. St. 282, 35 Atl. 235, the supreme court of Pennsylvania, in a case very similar to the one at bar, used the following language:

"The lessee was bound to use all proper efforts and exertions to find ore, and, if found, to mine and take it away, and to take out at least enough in each year to yield $400 annually, and if he did not take out that much he was bound to pay the $400 annually in any event; but, of course, this obligation proceeded upon the assumption that the ore was there, and continued to be there, in sufficient quantity to enable the lessee to perform his contract in this respect. If the ore was not there at all, or became exhausted, so that it could be no longer taken out in such

quantity, the lessee was not bound to pay for it. He could not do an impossible thing, and therefore could not be held liable for not doing it. There is nothing in this lease, or in the contract between the plaintiffs and defendant, which required him to do what he could not possibly do, or else to pay for not doing it. Neither the lease nor the contract is a sale of the ore in place for a definite, fixed, minimum sum, as was the case in *Timlin v. Brown.*"

It will be noticed that this citation contains a reference to the case of *Timlin v. Brown,* 158 Pa. St. 606, 28 Atl. 236, which case is cited by respondent in the case at bar, and apparently much relied on by him. The case just mentioned is clearly distinguished in the case above cited, and, as we think, shown to be inapplicable to the facts of a case like the one at bar. In the case of *Diamond Iron Min. Co. v. Buckeye Iron Min. Co.,* 70 Minn. 500, 73 N. W. 507, the supreme court of Minnesota, in considering a lease similar to the one involved here, used the following language:

"Mining leases containing a covenant for the payment of a miuimum rent or royalty may be divided into two general classes: First, those which require its payment as a dead rent, irrespective of produce; and, second, those which require the mining of a stipulated amount of ore, or, upon failure to do so, payment of the royalty upon it. Where the covenant is of the first class, the lessee is liable to pay this minimum royalty as a dead rent, even if no ore existed. Where the covenant is of the second class, it has been generally construed as an obligation to pay for the stipulated quantity of ore, whether mined or not; not whether it existed or not—that is, that the lessee contracts for diligence, and promptitude in mining, but not for the productiveness of the mine. . . . In the present case, merchantable shipping iron ore, which the parties supposed existed, and not the land, was the subject-matter of these contracts. It is true, they start out in form as leases of the land; but this is only for mining purposes,

and every right which the defendant is given in the land is merely incident and auxiliary to mining and taking out merchantable shipping ore."

In the case of *Ridgely v. Conewago Iron Co.*, 53 Fed. 988, the United States circuit court, in speaking of mining leases, said:

"These covenants are not all the same, or to the same effect. They may be divided into two classes: First, those which require the payment of rent irrespective of produce; second, those which require that, upon failure to take out a stipulated quantity, royalty with respect thereto shall nevertheless be paid. Where the covenant is of the first class the tenant is liable for the rent, even if nothing could be got by mining. . . . Where the covenant is of the second class his obligation is to pay for the stipulated quantity, whether mined or not; not whether it exists or not. He contracts for promtitude and thoroughness in mining; not for the productiveness of the mine. *Lord Clifford v. Watts*, L. R. 5 C. P. 577; *Muhlenberg v. Henning*, 166 Pa. St. 138, 9 Atl. Rep. 144."

The supreme court of Pennsylvania, again considering this question in the case of *Bannan v. Graeff*, 186 Pa. St. 648, 40 Atl. 805, used the following language:

"If, therefore, the coal on the premises became exhausted before the end of the term, this would be an occurrence beyond their control which would absolutely prevent them from taking out the quantity necessary to make up the annual rental of $5,000;"

and the court held that the lessee was thereupon released from further payment. This case also refers to and distinguishes the case of *Timlin v. Brown*, mentioned above. In the case of *Walker v. Tucker*, 70 Ill. 527, the supreme court of Illinois said, at page 543:

"But where, from the nature of the covenant, it is apparent the parties contracted on the basis of the continued existence of a given person or thing, a condition is implied

that, if the performance became impossible from the per-
ishing of the person or thing, that shall excuse such per-
formance. Id. [1 Chitty on Conts. (11 Am. ed.)] 1076.
If, therefore, the coal mine was exhausted the appellants
were excused from further working it."

In the case of *Gribben v. Atkinson*, 64 Mich. 651, 31
N. W. 570, the supreme court of Michigan said:

"The plaintiffs, by the twelfth section of the lease, ex-
pressly reserved to themselves the use and possession of
the land for every other purpose; and the right to cut
timber on the land was also expressly restricted to such
timber as might be wanted for mining purposes. Being
such a lease, if, upon diligent search and exploration, no
iron ore was found, and none exists in or under the soil,
the defendant cannot be held liable for the royalty upon
such ore. *Cook v. Andrews*, 36 Ohio St. 174; *Brick Co. v.
Pond*, 38 Ohio St. 65; *Reed v. Beck*, 66 Iowa 21, 23 N. W.
Rep. 159."

Bishop on Contracts, § 588, reads as follows:

"If the contract assumes the continued existence of the
thing, then, on performance becoming due, if, without the
fault of the parties, the thing has ceased to exist, the case
has become one of mutual mistake, and the duty to per-
form no longer remains."

Other cases bearing upon the questions involved here
are: *Allen v. Hammond*, 11 Peters 63, 9 L. Ed. 633;
*Cook v. Andrews*, 36 Ohio St. 174; *Gribben v. Atkinson*,
*supra; Fritzler v. Robinson*, 70 Iowa 500, 31 N. W. 61;
*Hewitt Iron Min. Co. v. Dessau Co.*, 129 Mich. 590, 89
N. W. 365; *Brick Co. v. Pond*, 38 Ohio St. 65; *McCahan
v. Wharton*, 121 Pa. St. 424, 15 Atl. 615.

Respondent argues that, because the lease provided for
its termination in any of four methods, it could not have
been terminated in the manner attempted by appellant.
In the case of *Diamond Iron Min. Co. v. Buckeye Iron
Min. Co., supra*, the court, addressing itself to a similar

contention, said: "We do not think that any such inference can be fairly drawn from that provision."

In *Porter v. Tull,* 6 Wash. 408, 33 Pac. 965, 36 Am. St. 172, 22 L. R. A. 613, this court held that a lessee, who had paid rent on part of a building for a month in advance, was entitled to recover back a proportionate part of said payment, when the building was destroyed by fire before the expiration of the month. This holding was doubtless upon the theory that the subject-matter of the lease was destroyed. In the case at bar, respondent argues that the land is the subject-matter, and the clay but an incident. When we consider that the lease restricted the use of the demised premises to one purpose only, and that purpose one which contemplated the use of the clay, it is difficult to avoid the conclusion that the real subject-matter of the lease was terminated when the clay became exhausted. It is suggested by respondent that the finding made by the trial court as to the clay having become exhausted was erroneous, and was excepted to by him. We have examined the evidence and feel that the finding is amply justified.

Believing that the weight of authority, and the better reasoning upon principle, sustain the appellant's contention, it is ordered that the judgment of the honorable trial court be reversed, and the case remanded with instructions to dismiss the action.

MOUNT, C. J., DUNBAR, RUDKIN, and CROW, JJ., concur.

HADLEY and FULLERTON, JJ., took no part.