[No. 24700. Department Two. November 27, 1933.]

CAPITAL SAVINGS & LOAN ASSOCIATION, *Appellant*, v.
W. H. CONVEY *et al., Respondents.*[1]

*Bigelow & Manier* and *Yantis & Brodie,* for appellant.

*S. A. Gagliardi,* for respondents.

[1] Reported in 27 P. (2d) 136.

BLAKE, J.—In 1917, there was erected, by the then owner, a cold storage warehouse on lots 9, 10, 11, 12 and 13, block 11, Orchard's Addition to New Tacoma. Sometime prior to June 21, 1927, the plaintiff became the owner of the property, and operated it as a cold storage plant. On the last mentioned date, plaintiff and defendant entered into a contract whereby plaintiff agreed to sell and defendant agreed to buy the property, including equipment of all kinds. In other words, plaintiff sold and defendant bought an operating cold storage plant. No representations or warranties were made by plaintiff, however, as to the structural character of the building or equipment.

The building covered a ground area ninety by one hundred feet, the shorter dimension extending north and south. The structure was apparently built as one unit. The basement, however, did not extend under the south twenty feet of the building. Defendant, while denying that he knew of this at the time he purchased the property, admitted that he learned of the fact in 1928. This south twenty feet of the building was a sort of lean-to or addition to the portion of the building over the basement. The latter portion was well constructed, and fully adapted to the use for which it was designed. The south twenty feet was of lighter construction, and, at the time of trial, at least, did not comply with the city ordinance as to carrying load.

In this southerly addition, there were three cold storage rooms and a passageway. The passageway was adjacent to the main building, and provided ingress and egress, not only to the three rooms in the addition, but also to three cold storage rooms in the main building.

The defendant paid four thousand dollars when the contract was executed. He agreed to pay fifty dollars

on the first of July, 1929, and fifty dollars a month thereafter until the balance was paid. He also agreed to pay taxes and insurance. He made the payments of fifty dollars a month until April, 1931, since which time he has made no further payments, although two inconsequential items were credited to him by plaintiff on account of collections of insurance made by the latter for small fire losses.

In November, 1931, the floor in two of the storerooms and a portion of the passageway in the addition to the main building gave way. At the time, it would have cost less than six hundred dollars to restore it to the condition it was in at the time defendant entered into the contract to buy the property. To rebuild it with a carrying capacity required by the building ordinances would cost $1,500 to $2,500, in the judgment of various building contractors who testified. One who testified for defendant said that for $3,300 the addition could be built, with basement, to conform to the main structure.

Each party claiming the other responsible for the restoration, and each refusing to repair, plaintiff brought this action to forfeit the contract, forfeit payments made by defendant, and for possession of the property. The defendant countered with a cross-complaint, praying for rescission. The court granted a rescission, and awarded defendant $8,279.16. This amount covered payments on the contract, taxes, insurance premiums and cost of improvements made on the property by defendant. Plaintiff appeals.

Appellant contends that, in the absence of fraud, misrepresentation or express guaranty, the purchaser takes the risk of quality. This is doubtless the generally accepted rule as to executed contracts. It may be conceded that this rule is applied to executory contracts, as well, by a majority of the courts. But a

substantial minority, of which this court is one, hold that loss, occurring before the time fixed for performance, without the fault of either party, falls on the vendor. *Libman v. Levenson,* 236 Mass. 221, 128 N. E. 13, 22 A. L. R. 560 (where the cases on the subject are assembled in an extensive note); *Conlin v. Osborn,* 161 Cal. 659, 120 Pac. 755; *Page v. Loeffler,* 146 La. 890, 84 So. 194, 22 A. L. R. 563; *Ashford v. Reese,* 132 Wash. 649, 233 Pac. 29.

In the case of *Libman v. Levenson, supra,* Justice Rugg, dealing with a case involving the collapse of a retaining wall, said:

"This hardly can be regarded as an open question in this Commonwealth. In *Thompson v. Gould,* 20 Pick. 134, a contract had been made for the purchase and sale of land but before the time for performance the house thereon was burned. It was said at page 138: 'Nor could this contract be enforced by a court of equity having jurisdiction of the subject matter, for by the destruction of the house the defendant is no longer able to perform his part of the contract. He may make compensation for the destruction of the house, but generally a purchaser, independently of special circumstances, is not to be compelled to take an indemnity, but he may elect to recover back the purchase money, if paid in advance, and if the vendor refuses or is unable on his part to perform the contract, and the purchaser has no legal remedy to recover damages'."

This brings us to the question as to whether respondent is entitled to rescission on the ground of partial failure of consideration. Are there any "special circumstances" by reason of which he should "be compelled to take an indemnity?" It must be conceded that rescission usually lies where the partial failure of consideration is substantial. But it will not be granted in all cases. Where the partial failure of consideration is slight in comparison with the whole

consideration and the subject matter of the contract, where damages are easily ascertainable and the vendee can be thereby fully compensated, and where a rescission would be grossly inequitable to the vendor, the purchaser will not be permitted to rescind, but will be allowed a proportionate abatement from the purchase price. 39 Cyc. 1408; *Mast v. Hoover,* 126 Wash. 148, 217 Pac. 718; *Speed v. Bailey,* 153 Md. 655, 139 Atl. 534; *Labar v. Lindstrom,* 158 Minn. 453, 197 N. W. 756; *Murphy v. Sheftel,* 121 Cal. App. 533, 9 P. (2d) 568.

We think this is such a case. While the trial court found that twenty-five per cent to fifty per cent of the revenue-producing space was lost by the collapse of the floor, we do not think the finding was justified by the evidence. The finding was predicated on the theory that two of the rooms in the main part of the building were rendered inaccessible by reason of the sagging of the floor in the passageway. These rooms could have been easily rendered accessible by the repair of the floor in the passageway. This could have been done at slight expense. We are convinced that these rooms in the main building remained inaccessible through the choice of respondent, rather than through necessity.

So, leaving out of consideration the rooms in the main building, we find that the storage rooms in the addition, of the use of which respondent was deprived, comprise only eight per cent of the cold storage space in the building. The cost of restoring that space in the same condition as it was in at the time of sale was less than six hundred dollars—about four per cent of the purchase price. According to evidence offered by respondent, for $2,300 the addition can be made to conform to ordinance requirements with the same structural character as the main building. Appellant's

evidence was to the effect that this could be done for $1,500.

It must be borne in mind that respondent has had the use and occupancy of an operating plant—not merely a building. The rental value of such a plant is extremely problematical, if it has any. For it is obvious that the value of such a plant depends primarily upon the ability of the operator to make a profit. The fundamental theory of rescission is that neither party will be hurt by it; that the *status quo* of the parties can be established. We do not think that, by charging respondent for the use and occupation of the property, the appellant can be made whole. On the other hand, the respondent can be fully compensated in damages.

We think the respondent is entitled to set off against the purchase price an amount which is sufficient to put the addition in the condition it would have been in June 21, 1927, had it been of the same structural character as the main building. *Murphy v. Sheftel,* 121 Cal. App. 533, 9 P. (2d) 568. As to this amount, there is a difference of eight hundred dollars between the estimate of the highest witness for appellant and the estimate of the lowest for respondent.

None of the testimony seems to take into account the element of obsolescence. The building was ten years old when respondent purchased it. There is no direct testimony as to the rate of depreciation allowed on such structures, although it appears from the testimony of respondent that he charged off depreciation on the whole plant at the rate of fifty dollars per month. This amounts to about four per cent on the purchase price. At this rate, taking respondent's testimony of cost of restoration as a basis, the depreciation over a period of ten years would bring the amount of

damages below that fixed even by appellant's witnesses.

On the other hand, the appellant can hardly complain if its figures as to the cost of restoration be adopted without making allowance for depreciation, since it did not take account of that element itself. Furthermore, we are persuaded that, taking the record as a whole, $1,500 is a reasonable amount to be allowed respondent as damages.

The cause is remanded, with directions to dismiss appellant's complaint and to enter judgment upon the cross-complaint, allowing the respondent $1,500 as an offset against the purchase price.

BEALS, C. J., TOLMAN, GERAGHTY, and HOLCOMB, JJ., concur.