[No. 8636–4–III.   Division Three.   May 17, 1988.]

WASHINGTON STATE HOP PRODUCERS, INC. LIQUIDATION TRUST, ET AL, *Appellants,* v. GOSCHIE FARMS, INC., ET AL, *Respondents.*

ADAMS VIEW FARMS, INC., ET AL, *Respondents,* v. WASHINGTON STATE HOP PRODUCERS, INC. LIQUIDATION TRUST, ET AL, *Appellants.*

*Philip A. Talmadge, Philip Cutler, Scott Milburn,* and *Karr, Tuttle, Koch, Campbell, Mawer, Morrow & Sax, P.S.,* for appellants.

*Corinna Ripfel–Harn, John S. Moore, Velikanje, Moore & Shore, Vincent Beaulaurier,* and *Lyon, Beaulaurier, Weigand, Suko & Gustafson,* for respondents.

MUNSON, J.—Washington State Hop Producers, Inc. Liquidation Trust (Trust) and James W. Butzow, the liquidating trustee, appeal the superior court's summary judgment in favor of the hop growers, rescinding various contracts for the purchase of hop allotments. They contend the court erred in: (1) granting summary judgment, (2) denying their motion for summary judgment, and (3) denying their motion for reconsideration. We affirm.

In 1966, a federal marketing act required hop producers to obtain allotments from the United States Department of Agriculture in order to market their hops. 7 C.F.R. § 991 (1985). The hop growers were provided an annual allotment based upon past yields and the number of acres dedicated to producing hops. The total number of allotments available in any one year was regulated by the Secretary of Agriculture upon recommendation by the hop administrative committee (HAC). The ultimate purpose of this regulatory scheme was to establish a stable and orderly market for hops by annually adjusting the supply of salable hops to market needs.

The hop growers were also permitted to transfer their excess allotments to other growers. Once the HAC was notified and certain conditions met, a transfer would be recognized as part of the purchaser's annual allotment. As a result of this ability to transfer allotments, some hop growers became active in the business of acquiring, leasing, and selling hop allotments.

The Washington State Hop Producers, Inc. (WSHP) is a corporation, established by several hop producers for the purpose of acquiring, leasing, and selling hop allotments. It operated as an agricultural cooperative association and acted as a broker for some of its members. The allotment remained in the name of the seller, WSHP advertised for bids and would accept the bids. Thereafter, a meeting would be scheduled at the HAC office where the actual sale and transfer would occur between the buyer and the seller.

From 1983 to 1985, the Department of Agriculture conducted several hearings to consider amending the regulations. Most of these growers sought relatively minor changes affecting either the total allotments available or the ability to transfer allotments between growers. A small minority, however, advocated the total abandonment of the allotment system. The hop growers were generally apprised of the progress of these hearings through bulletins issued by the HAC. As late as June 1985, the HAC and many growers did not anticipate the marketing order would be terminated.

The WSHP petitioned the superior court for a supervising order seeking to liquidate and ultimately dissolve the corporation. In its order of February 27, 1985, the court had all the corporate assets, subject to its corporation liabilities, transferred to a liquidating trust and designated Mr. Butzow as liquidating trustee.

In May 1985, the Trust solicited bids from a number of growers for the 1,066,139 pounds of hop allotment base it held as a result of the order of liquidation and dissolution. The proposed sale included two separate pools: Pool A consisted of allotments available for use in 1985; Pool B consisted of allotments subject to existing leasing for 1985, but available for use in 1986. The Trust received the bids and mailed notices of acceptance to the hop growers on June 21, 1985. On June 27, the Secretary of Agriculture announced that the hop marketing order would be terminated effective December 31, 1985. This termination order

was published in the Federal Register on July 1, 1985. On July 23, the Trust notified the hop growers that the transfer of hop allotments would be conducted at the Yakima HAC office on July 26. While some of the growers appeared and paid their bid price, many growers failed to appear and later refused to execute allotment transfer forms.[1]

After the growers' refusal to honor their bids, the Trust was able to sell some of its 1985 allotment at prices ranging from $.0025 to $.05 per pound. The original bids, accepted by the Trust but not honored by some of the growers, ranged from $.50 to $.76 per pound.

Those growers who had paid their bid price brought an action for return of their money; the Trust sued the non-paying bidders for payment of the bid price. These actions were consolidated. The court granted summary judgment holding the Trust was not entitled to collect from the non-paying growers and those growers who had paid were entitled to return of all moneys. The order was based on several grounds: lack of consideration, mutual mistake of fact, impossibility of performance, destruction of the specific thing necessary for performance, and unjust enrichment. The Trust and trustees' direct review to the Supreme Court was transferred to this court.

The Trust attacks every basis of the court's order. While several may have merit, we find that one ground supports the court order, namely, supervening impracticability.

*Metropolitan Park Dist. v. Griffith,* 106 Wn.2d 425, 723 P.2d 1093 (1986) recognized the defense of impossibility, citing *Thornton v. Interstate Sec. Co.,* 35 Wn. App. 19, 666 P.2d 370, *review denied,* 100 Wn.2d 1015 (1983) which in turn cited *Liner v. Armstrong Homes of Bremerton, Inc.,* 19 Wn. App. 921, 579 P.2d 367 (1978), as well as Restatement of Contracts §§ 454, 455, and 457 (1932). Restatement

---

[1]Subsequently, Congress enacted legislation preventing the Secretary from terminating the marketing order as of December 31, 1985. However, on February 4, 1986, the Department of Agriculture issued an order suspending 7 C.F.R. § 991, effective February 10, 1986. The marketing order was terminated October 1986.

(Second) of Contracts (1981) has rewritten these sections and those pertinent here are as follows:

§ 261:

Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non–occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary.

An introductory note to chapter 11 preceding § 261 states, at pages 309–10:

An extraordinary circumstance may make performance so vitally different from what was reasonably to be expected as to alter the essential nature of that performance. In such a case the court must determine whether justice requires a departure from the general rule that the obligor bear the risk that the contract may become more burdensome or less desirable. . . . The question is generally considered to be one of law rather than fact, for the court rather than the jury. . . .

. . .

Usually the impracticability or frustration that is relied upon as a justification for non–performance occurred after the contract was made.

§ 265:

Where, after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non–occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged, unless the language or the circumstances indicate the contrary.

Comment *a* to § 265 denotes the difference between the four preceding sections and § 265; namely, in § 265 there is *no impediment to performance by either party*. It denotes the elements as: (1) the purpose that is frustrated must have been a principal purpose of that party making the contract, (2) the frustration must be substantial, (3) the *nonoccurrence of the frustrating event must have been a basic assumption on which the contract was made*, and (4)

neither the language nor the circumstances indicate the contrary. *See Chicago, M., St. P. & Pac. R.R. v. Chicago & North Western Transp. Co.,* 82 Wis. 2d 514, 263 N.W.2d 189 (1978).

Restatement (Second) of Contracts (1981) denotes that the first Restatement of Contracts (1932) talked of impossibility, whereas the Restatement (Second) speaks in terms of impracticability as distinguished from impracticable.

> A mere change in the degree of difficulty or expense due to such causes as increased wages, prices of raw materials, or costs of construction, unless well beyond the normal range, does not amount to impracticability since it is this sort of risk that a fixed–price contract is intended to cover.

Restatement (Second) of Contracts § 261, comment *d* (1981). Rather, impracticability has been described as extreme or unreasonable difficulty, expense, injury, or loss to one of the parties.

Here, we find the principal purpose of this contract was to purchase a hop allotment base provided and created pursuant to a hop marketing agreement. As is evident when the marketing order was terminated, effective December 31, 1985, the value of that allotment decreased, assuming a bid of $.50 fell to $.05, *i.e.,* one–tenth the bid price. We consider that a substantial frustration falling within the rule.

Although both parties were aware of the discussions pro and con over the past few years of continuation of the agreement, there is no question neither party knew of the impending termination. In fact, this record reflects the Secretary of Agriculture himself did not know the marketing order had been terminated by an assistant secretary until it was called to his attention. Thus, we would find there was a basic assumption by the parties that the marketing order would remain operative.

While the Trust seeks to hold the growers to knowledge that the order could be terminated at any time, it takes no responsibility for the same knowledge. Both parties are in

the same business. Both parties were aware from its inception the marketing act could be terminated at the discretion of the Secretary of Agriculture. Both parties were aware of the discussions that had been held; yet neither the Trust in its bid form nor the growers in their acceptance placed the risk on the other party or themselves in the event the marketing order was terminated. As noted in Restatement (Second) of Contracts § 261, comment *c* (1981): "If the supervening event was not reasonably foreseeable when the contract was made, the party claiming discharge can hardly be expected to have provided against its occurrence." We find without this basic assumption there would neither have been an offer nor an acceptance. Thus, there being no language in the contract or bid forms for one side or the other to bear the risk of termination, we find none existed. Further, as noted in § 265, comment *a*, "the mere fact that the event was foreseeable does not compel the conclusion that its non–occurrence was not such a basic assumption."

Thus, we find there is a proper ground for the order on summary judgment. We discuss the other grounds rather summarily. We find there was no mutual mistake of fact; the marketing order was in existence at the time the contract was entered into. The marketing order was terminated after the contract was made. *Simonson v. Fendell,* 101 Wn.2d 88, 675 P.2d 1218 (1984).

Likewise, failure of consideration, while applicable to Pool B, is not applicable to Pool A because on this record there is nothing which explains the manner in which hops are sold. For the purpose of summary judgment, they could have been sold by December 31, 1985, thus the grower would have been required to show his hop allotment base.

Further, impossibility is not applicable if one considers true impossibility. Here, the Trust had allotment base to sell and, in fact, some growers paid the price for the allotment. So, there was no impossibility as to the Trust being able to deliver the hop allotment base and there is no showing the grower had an impossibility of payment.

Having decided the theory of impracticability is applicable to both pools, we affirm the order on summary judgment.[2]

Summary judgment is affirmed.

MCINTURFF, C.J., and GREEN, J., concur.

Review granted by Supreme Court October 6, 1988.

---

[2]*See Harper & Assocs. v. Printers, Inc.,* 46 Wn. App. 417, 730 P.2d 733 (1986), *review denied,* 108 Wn.2d 1002 (1987) which interprets RCW 62A.2–615 and to which analogy is made in the commentary to Restatement (Second) of Contracts § 261 (1981).