[No. 55255-0. En Banc. May 25, 1989.]

WASHINGTON STATE HOP PRODUCERS, INC. LIQUIDATION TRUST, ET AL, *Petitioners,* v. GOSCHIE FARMS, INC., ET AL, *Respondents.*

ADAMS VIEW FARMS, INC., *Respondent,* v. WASHINGTON STATE HOP PRODUCERS, INC. LIQUIDATION TRUST, ET AL, *Petitioners.*

PERRAULT FARMS, INC., *Respondent,* v. WASHINGTON STATE HOP PRODUCERS, INC. LIQUIDATION TRUST, ET AL, *Petitioners.*

HEFFLINGER RANCHES, INC., ET AL, *Respondents,* v. JAMES W. BUTZOW, *Petitioner.*

*Philip E. Cutler* and *Philip A. Talmadge* (of *Karr, Tuttle, Campbell*), for petitioners.

*Velikanje, Moore & Shore,* by *John S. Moore* and *Corinna D. Ripfel–Harn,* and *Lyon, Beaulaurier, Weigand, Suko & Gustafson,* by *V.J. Beaulaurier,* for respondents.

SMITH, J.—Petitioner Washington State Hop Producers, Inc., Liquidation Trust (Trust) sought enforcement of contracts requiring respondents (Growers) to pay for allotments required by federal regulatory order to market hops (hop base). Termination of the order was announced after the Growers submitted their bids, but before the time set by the Trust for its performance. The Yakima County Superior Court entered summary judgment in favor of respondent Growers ordering rescission and restitution. The Court of Appeals, Division Three, sustained the order. We affirm.

The issues presented by this case are:

1. Whether the Court of Appeals correctly applied the doctrine of supervening frustration, Restatement (Second) of Contracts § 265 (1979),[1] in affirming rescission of contracts notwithstanding that hop base retained at least some value after termination of the federal regulatory order and that termination was arguably foreseeable; and

2. Whether respondents are entitled to prejudgment interest if rescission is the proper remedy.

For 20 years until July 1985, under 7 C.F.R. § 991, hop producers were required to obtain allotments from the United States Department of Agriculture (USDA) in order to market their hops. This was called "hop base." Growers were permitted to transfer their excess allotments to other growers. Because the base requirement represented a barrier to market entry, and because virtually no new base was released, "hop base" became a scarce commodity commanding a high price. A secondary market developed for trading in hop base. Washington State Hop Producers, Inc.,

---

[1]The Court of Appeals referred also to section 261 of the Restatement ("supervening impracticability"). Because we conclude that section 265 is dispositive of this case, we do not further consider the applicability of section 261.

is a corporation established for the purpose of acquiring, leasing, and selling federal hop base.

After 1979, various groups of hop growers dissatisfied with the allotment system organized to change the marketing order. This culminated in a lawsuit in Spokane in July 1981. As early as 1983, the USDA announced its intention to phase out all barriers to hop market entry; but through 1984 the agency considered amendments to the existing marketing order. Among those amendments were provisions which would have terminated the marketing order or its effect in limiting hop production. However, as appellant states in its brief "[a]s late as June, 1985 . . . it was not anticipated that any substantial change in the Marketing Order would be proposed by the Secretary of Agriculture."

Against this background, in February 1985 Washington State Hop Producers, Inc., filed a petition for court supervised liquidation, giving rise to the Trust. On May 31, 1985, the Trust mailed invitations to bid, offering two "pools" of hop base for sale. Pool "A" consisted of 633,500 pounds of hop base available for use in 1985. Pool "B" consisted of 432,639 pounds of hop base subject to rental commitments for the 1985 crop year, but available for use in 1986.

By June 16, 1985, bids were received ranging from 10½ cents ($0.105) per pound to 76 cents ($0.76) per pound. Successful bids were for 50 cents ($0.50) to 76 cents ($0.76) per pound. The annual rental rate for hop base was 6 cents ($0.06) per pound.

The bid of 10½ cents ($0.105) per pound came from unsuccessful bidder Victor W. Belaire. In his declaration, he stated his bid was based on his knowledge that hop base might become valueless. He also offered his opinion that all prospective purchasers of hop base knew this might happen. There is no further indication in the record that other bids in this range were received by the Trust in response to its May 1985 invitations.

On June 21, 1985, the Trust mailed notices of award to the highest bidders, including all respondent Growers in this case. Payments were received from some of the growers

through June 27, 1985, and from one grower on July 1, 1985. Coleman Farms, Goschie Farms and Gem Hop did not forward payment. Back Acre Hop Farms, Inc., forwarded a check, but stopped payment on it.

The USDA terminated the marketing order on June 27, 1985, effective December 31, 1985. The termination order was published in the Federal Register on July 1, 1985. 50 Fed. Reg. 26,977 (1985).

During the period July 21 to July 23, 1985, the Trust notified respondent Growers that the base would be transferred on July 26, 1985, and requested them to appear on that date and receive it. They did not appear.

Although transactions with Growers were not completed, the Trust subsequently did sell 208,192 pounds of Pool "B" hop base for a total of $1,470.48, or an average price of about 7/10 cent ($0.007) per pound. Bids accepted were 5 cents ($0.05) and 1/4 cent ($0.0025), compared with earlier successful bids of respondent Growers of as much as 60 cents ($0.60) per pound. The "Sale Agreement" forms supplied by the Trust after issuance of the termination order contained the following language:

> 4. Disclaimer of Warranties. Buyer acknowledges that Buyer is aware of the provisions of the "Termination Order" published in 50 Fed. Reg. 26977–78 (No. 126; Monday, July 1, 1985), which terminates the Federal Marketing Order for domestically produced hops effective December 31, 1985. The Seller gives no warranty, express or implied, as to description, quality, merchantability, fitness for any particular purpose, productiveness, or any other matter, of the hop allotment base, and the Buyer hereby waives all rights of refusal and return of the goods.

On August 6 and August 8, 1985, Growers filed three suits against the Trust in Yakima County Superior Court. On November 4, 1985, the Trust also filed suit against respondent Goschie Farms and other named defendants in the same court.

All parties filed motions for summary judgment. On July 24, 1986, appellant Trust's motions were denied and

respondent Growers' motions were granted. The court stated:

[T]he court finds and determines that there are no genuine issues of material fact and that [Growers] are entitled to summary judgment in their favor, as a matter of law, on the grounds of (1) failure of consideration, (2) mutual mistake of material fact, (3) supervening impossibility of performance and/or commercial frustration, and (4) non–existence of specific thing purchased and necessary for performance by [Trust] in 1986.

The USDA terminated remaining provisions of the Hop Marketing Order effective October 31, 1986.

The Court of Appeals, Division Three, in a published opinion sustained the trial court's ruling. *Washington State Hop Producers, Inc. Liquidation Trust v. Goschie Farms, Inc.,* 51 Wn. App. 484, 754 P.2d 139 (1988). The Court of Appeals noted that the "Trust attacks every basis of the court's order. While several may have merit, we find that one ground supports the court order, namely, supervening impracticability." 51 Wn. App. at 487. The court cited Restatement (Second) of Contracts § 265 (1979) which states the rule for *supervening frustration.* We conclude that the appeal was denied on the basis of supervening frustration, although referred to as "supervening impracticability" by the court.

The Trust appealed to this court. We granted review on October 6, 1988.

Perhaps the earliest case clearly recognizing frustration of purpose as a defense in a breach of contract action is *Krell v. Henry,* [1903] 2 K.B. 740 (Ct. App.). There, a lease was made to rent use of a window overlooking the route for the coronation parade of Albert Edward when he succeeded his mother, Queen Victoria. After the agreement, Edward became ill, the parade was canceled, and the purpose of renting the window was frustrated. The lessee refused to pay the agreed rent. The court held that his duty was discharged and that he was therefore not liable for breach. Both parties were capable of performing the terms of their

contracts, and there was arguably still some market value in the vendor's performance. But the lessee's ultimate purpose was frustrated and he was released from his contract nonetheless.

The doctrine of "Discharge by Supervening Frustration" is recited in Restatement (Second) of Contracts § 265 (1979):

Where, after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non–occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged, unless the language or the circumstances indicate the contrary.

Comment *a* to the section further explains:

This Section deals with the problem that arises when a change in circumstances makes one party's performance virtually worthless to the other, frustrating his purpose in making the contract. . . . First, the purpose that is frustrated must have been a principal purpose of that party in making the contract. . . . The object must be so completely the basis of the contract that, as both parties understand, without it the transaction would make little sense. Second, the frustration must be substantial. It is not enough that the transaction has become less profitable for the affected party or even that he will sustain a loss. The frustration must be so severe that it is not fairly to be regarded as within the risks that he assumed under the contract. Third, the non–occurrence of the frustrating event must have been a basic assumption on which the contract was made. . . . The foreseeability of the event is . . . a factor in that determination, but the mere fact that the event was foreseeable does not compel the conclusion that its non–occurrence was not such a basic assumption.

This is the rule and test recited and applied by the Court of Appeals. *See Washington State Hop Producers, Inc. Liquidation Trust v. Goschie Farms, Inc.,* 51 Wn. App. 484, 488, 754 P.2d 139 (1988). It also has a foundation in the case law of this state. *See, e.g., Weyerhaeuser Real Estate Co. v. Stoneway Concrete, Inc.,* 96 Wn.2d 558, 637 P.2d 647

(1981); *Weyerhaeuser Real Estate Co. v. Stoneway Concrete, Inc.,* 26 Wn. App. 882, 614 P.2d 249 (1980), *rev'd,* 96 Wn.2d 558, 637 P.2d 647 (1981); *Adams v. Washington Brick, Lime & Mfg. Co.,* 38 Wash. 243, 80 P. 446 (1905). *See also Capital Sav. & Loan Ass'n v. Convey,* 175 Wash. 224, 227, 27 P.2d 136 (1933) ("It must be conceded that rescission usually lies where the partial failure of consideration is substantial."). However, Washington has not before now adopted the doctrine of supervening frustration as recited in Restatement (Second) of Contracts § 265 (1979).

Under the restatement formula, "the purpose that is frustrated must have been a principal purpose of that party in making the contract . . . without [which] the transaction would make little sense." Restatement (Second) of Contracts § 265, comment *a* (1979). The Court of Appeals found "the principal purpose of this contract was to purchase a hop allotment base provided and created pursuant to a hop marketing agreement." *Washington State Hop Producers, Inc. Liquidation Trust v. Goschie Farms, Inc.,* 51 Wn. App. 484, 489, 754 P.2d 139 (1988). We agree.

Under the conditions prevailing for nearly 20 years before the termination order, ownership of hop base provided permanent access to the hop market otherwise unavailable. After the termination, what was available to "purchase" was at most access to the 1985 crop year market. The Trust had formerly been in the business of renting 1–year access to the hop market. The Growers did not seek single–year market access, nor did they bid prices in the range of the 1–year rental (6 cents ($0.06) per pound). Without the federal requirement of hop base, there would have been no subject matter for the contracts nor any consideration from the Trust to support the transactions. Because the Growers sought to *purchase* hop base instead of renting it, the inference is that *future* market access was their principal purpose in entering the transactions. This purpose was understood by both parties. Purchase, as opposed to rental, of the hop base made little sense without

future market access. The record provides sufficient undisputed facts to sustain the Court of Appeals' determination on this point.

The Court of Appeals relied upon the decline in value of hop allotments in determining that the purpose of the contracts had been frustrated by termination of the hop marketing order. The pertinent language from the appellate opinion is:

> Here, we find the principal purpose of this contract was to purchase a hop allotment base provided and created pursuant to a hop marketing agreement. As is evident when the marketing order was terminated, effective December 31, 1985, the value of that allotment decreased [in June 1985 when the termination was announced], assuming a bid of $.50 fell to $.05, *i.e.*, one–tenth the bid price. We consider that a substantial frustration falling within the rule.

*Washington State Hop Producers, Inc. Liquidation Trust v. Goschie Farms, Inc.*, 51 Wn. App. 484, 489, 754 P.2d 139 (1988). It is not clear from the language employed whether the "frustration" is the 90 percent decline in market price, or whether the decline in value is merely evidence of the substantiality of the frustration.

The decline in price was great. Before the termination order, hop base was a prerequisite to the sale of hops. The annual *rental* price of hop base for 1985 was 6 cents per pound before the termination order. Successful bids to *purchase* Pool "A" hop base before termination ranged up to 76 cents per pound. After termination, hop base would be unnecessary following the 1985 crop year. Pool "B" hop base that had commanded a pre–termination price of not less than 50 cents (when it could be sold at all after the termination was announced) commanded an average price of just 7/10 of 1 cent ($0.007)—a 98 percent decrease in value.

There is no indication in the record that any Pool "A" base was sold by the Trust after the termination order, thus there is no basis for determining market price. However,

this can be estimated by analyzing the post–termination relationship of Pool "A" base to Pool "B" base.

After the termination order, hop base was still needed for the 1985 crop year. The rental price of base for the 1985 crop year demanded and received by the Trust for Pool "A" was 6 cents per pound.[2] Beyond the 1985 crop year, Pool "A" and Pool "B" bases were equivalent. That is, the only difference between the pools was access to the 1985 market. If post–termination Pool "B" base had an average sale price of 7/10 of 1 cent, then a rational market should have valued post–termination Pool "A" base at about 6 and 7/10 cents ($0.067) per pound.[3] The average pre–termination sale price of Pool "A" base was 54 cents ($0.54) per pound. Thus, the post–termination decrease remains in the range of 92 percent, even assuming that (1) all Pool "A" base had full rental value, and (2) all Pool "A" base would command the same price as the limited quantity of Pool "B" base actually sold.

The Pool "A" hop base retained some market value after cancellation of the order, and the 1985 hop base retained some utility for marketing the 1985 crop. If the decline in price alone is considered to be substantial frustration, then the decision of the Court of Appeals cannot be affirmed without doing violence to established principles of contract law. *See, e.g.,* Restatement (Second) of Contracts § 265, comment *a* (1979) ("It is not enough that the transaction has become less profitable for the affected party or even that he will sustain a loss."). The decision may be affirmed on other grounds, however.

 Post–termination order market price gives some measure of the magnitude of the frustration, but price alone cannot supply it. *See Kroblin Refrigerated Xpress, Inc. v. Pitterich,* 805 F.2d 96 (3d Cir. 1986); *In re M&M*

---

[2]The mere existence of Pool "B" base implies that not all Pool "A" base could be rented for 1985 at this rate.

[3]Not all available Pool "B" base could be sold after the termination, nor was it possible to sell all the Pool "A" base.

*Transp. Co.,* 13 B.R. 861 (Bankr. S.D.N.Y. 1981) (In both cases the object of the contract was obtaining ICC operating permits. Loss of market value of the rights because of deregulation, although substantial, did not support frustration and rescission.).

By contrast, a slight decline in market price would lead to an inference that any frustration was insubstantial. *See Capital Sav. & Loan Ass'n v. Convey,* 175 Wash. 224, 27 P.2d 136 (1933) (8 percent loss of useful footage insufficient to justify rescission); *Printing Indus. Ass'n of Northern Ohio, Inc. v. Graphic Arts Int'l Union, Local 546,* 628 F. Supp. 1103 (N.D. Ohio 1985) (differences in base wage rate from 2.6 percent to 5.9 percent not substantial); *accord, Printing Indus. Ass'n of Northern Ohio, Inc. v. International Printing & Graphic Communications Union, Local 56,* 584 F. Supp. 990 (N.D. Ohio 1984). Rescission based upon slight frustration would be inappropriate.[4]

If the decline in price is regarded merely as evidence of substantiality of frustration of the purpose of the contract, then the Court of Appeals' reasoning, as well as its decision, may stand. We believe this is the better view. Hop base existed only by virtue of the market order. Its value to these purchasers consisted not of its resale market price, but of its franchise to sell hops. Therefore, it is not the decline in market price, but the irrelevance of control of hop base after the 1985 crop year that supplies the frustration justifying rescission.

Application of the doctrine of frustration is a question of law and not a question of fact. 2 Restatement (Second) of Contracts 310 (1979); *see Columbian Nat'l Title Ins. Co. v. Township Title Servs., Inc.,* 659 F. Supp. 796 (D. Kan. 1987). Whether, as appellant states, "the value of the [Trust's] performance is . . . totally or nearly totally

---

[4]*Appellant may have been alluding to this in its petition for review, where it characterized the post–termination price decline as "a mere 16 percent reduction." However, the text discloses that the Trust is comparing pre–termination 1–year* rental *price of base with post–termination sale price. The decline in* sale *price was 90 percent or more, as correctly calculated by the Court of Appeals.*

destroyed by supervening events," as evidenced by the decline in price, seems a matter well within the sound judgment of the trial court. We will not disturb that court's determination.

In this case appellant Trust makes repeated references to "foreseeability" of the market order termination as invalidating the rescission granted by the trial court. However, as the Court of Appeals noted, "[w]hile the Trust seeks to hold the growers to knowledge that the order could be terminated at any time, it takes no responsibility for the same knowledge." *Washington State Hop Producers, Inc. Liquidation Trust v. Goschie Farms, Inc.,* 51 Wn. App. 484, 489, 754 P.2d 139 (1988). The court noted that the Trust had incorporated no language in its bid form allocating the risk to the growers. The court also noted that the growers had not included any allocating language in their "acceptance." This latter reference seems not to be made to any particular document. All documents and exhibits in the record comprising the transactions between the parties consist of forms provided by the Trust. The growers simply filled in blanks on bid forms provided by the Trust. There is no indication that any restrictive language could have been added by the growers. By contrast, the Trust had every opportunity to draft the language to its own advantage. It did not do so.

Moreover, the inference is that, even to the Trust, the termination was unforeseeable or at least not foreseen. The Trust included disclaimers in its post–termination announcement hop base sales documents. In its own brief, the Trust states, "[a]s late as June, 1985 . . . it was not anticipated that any substantial change in the Marketing Order would be proposed by the Secretary of Agriculture." In its introduction to chapter 11, the Restatement notes the significance of the "relative ease with which either party could have included a clause". 2 Restatement (Second) of Contracts, ch. 11 introductory note at 311 (1979). In context, this factor is equivalent to foreseeability in affecting the application of the doctrine.

■ Under the Restatement formula, foreseeability is merely a relevant factor in determining whether nonoccurrence of the frustrating event was a basic assumption of the frustrated party in entering the transaction. If that basic assumption is found, as it was here, the "issue" of foreseeability becomes irrelevant. Under the regulatory structure existing at the time the buyers submitted their bids, base would have been necessary to sell hops well into the future, as it had been for nearly 20 years. The trial court, implicitly, and the Court of Appeals, explicitly, found that continued need to own or control hop base in order to sell hops was an assumption central to the subject matter of the contract. The Court of Appeals concluded that "[w]e find without this basic assumption there would neither have been an offer nor an acceptance." 51 Wn. App. at 490.

By repeating its position, the Restatement is emphatic on the role of foreseeability. The introductory note to chapter 11 reads:

> The fact that the [frustrating] event was unforeseeable is significant as suggesting that its non–occurrence was a basic assumption. However, the fact that it was foreseeable, or even foreseen, does not, of itself, argue for a contrary conclusion, since the parties may not have thought it sufficiently important a risk to have made it a subject of their bargaining. Another significant factor may be the relative bargaining positions of the parties and the relative ease with which either party could have included a clause.

2 Restatement (Second) of Contracts at 311 (1979).

Appellant refers to the Restatement (Second) of Contracts § 261 in support of its contention that foreseeability avoids the defense of commercial frustration. The section is inapposite because it concerns the defense of supervening impracticability. Frustration is covered in § 265. However, even if the reference did apply, the language does not advance appellant's argument.

> A commercial practice under which a party might be expected to insure or otherwise secure himself against a risk also militates against shifting it to the other party. If

the supervening event was not reasonably foreseeable when the contract was made, the party claiming discharge can hardly be expected to have provided against its occurrence. However, if it was reasonably foreseeable, or even foreseen, the opposite conclusion [*i.e.,* that the party should not be discharged] does not necessarily follow.

Restatement (Second) of Contracts § 261, comment *c,* at 315. Cross reference is made to § 265, comment *a,* quoted above, and § 261, comment *c.* Pertinent language from this latter reference includes the following: "The fact that the event was foreseeable, *or even foreseen,* does not necessarily compel a conclusion that its non–occurrence was not a basic assumption." (Italics ours.) Restatement (Second) of Contracts § 261, comment *b,* at 314.

Appellant relies upon *Metropolitan Park Dist. v. Griffith,* 106 Wn.2d 425, 723 P.2d 1093 (1986), for the proposition that foreseeability avoids the defense of commercial frustration. This apparently is a reference to the following language: "Commercial frustration 'is limited to cases of extreme hardship where the event was not foreseeable and counterperformance is nearly or totally destroyed.'" *Griffith,* at 441, quoting *Thornton v. Interstate Sec. Co.,* 35 Wn. App. 19, 31 n.3, 666 P.2d 370, *review denied,* 100 Wn.2d 1015 (1983). No authority is cited in that footnote for the statement (although it may refer to cases collected in *Lloyd v. Murphy,* 25 Cal. 2d 48, 53–54, 153 P.2d 47, 50 (1944)) and it is in conflict with the Restatement. *Griffith* is distinguishable from this case. In *Griffith,* counter–performance was still valuable, and the parties had performed under the contract for some time. The doctrine under consideration was the "Non–Existence or Injury of Specific Thing or Person Necessary for Performance", Restatement of Contracts § 460 (1932) (Supervening frustration is considered in § 288 of the first Restatement.). Further, *Griffith* was not decided upon the question of foreseeability.

Although language suggesting that unforeseeability is a prerequisite of supervening frustration has found its way

into the case law of this state, *see, e.g., Weyerhaeuser Real Estate Co. v. Stoneway Concrete, Inc.,* 26 Wn. App. 882, 889, 614 P.2d 249 (1980) (Dore, J., dissenting), *rev'd,* 96 Wn.2d 558, 637 P.2d 647 (1981), the basis for this rule does not apply to this case. The Growers did not receive an estate in land, such as would be provided by a commercial lease, *see Lloyd v. Murphy,* 25 Cal. 2d 48, 153 P.2d 47 (1944), nor did they ever have the beneficial use of the subject matter of the contracts for which they request rescission.[5] The Restatement (Second) of Contracts repeatedly refers to foreseeability as only a factor in determining whether the non–occurrence of the frustrating event was an assumption basic to the contract. Moreover, foreseeability of a possible frustrating event is meaningful only where the party seeking relief could have controlled the language of the contract to the extent of allocating the risk. Here, exclusive control of the contract language was in the hands of the Trust and the Trust did not include disclaimers in its contracts until *after* the termination order.

▉ Finally, the Trust contends that the courts below erred in awarding the Growers prejudgment interest on the amounts held by the Trust as partial or full payments under the contracts. Prejudgment interest is awardable whenever a claim for damages is liquidated. A claim is liquidated "where the evidence furnishes data which, if believed, makes it possible to compute the amount with

---

[5]The fact that, at the time of the frustrating event, the Trust had not performed and the contract remained executory distinguishes this case from virtually all of the cases where relief based upon frustration has been denied the party requesting it, including all the lease cases and the progeny of *Lloyd v. Murphy,* 25 Cal. 2d 48, 153 P.2d 47 (1944), itself a lease case. *See, e.g., Capital Sav. & Loan Ass'n v. Convey,* 175 Wash. 224, 27 P.2d 136 (1933) (icehouse occupied 4 years before rescission demanded); *In re M&M Transp. Co.,* 13 B.R. 861 (Bankr. S.D.N.Y. 1981) (operation under interim permit for 18 months); *Megan v. Updike Grain Corp.,* 94 F.2d 551 (8th Cir.) (grain elevator rented for 7 years before unfavorable change in rail tariffs), *cert. dismissed per stipulation,* 305 U.S. 663 (1938); *Lloyd v. Murphy, supra* (lease of premises for automobile dealership for 4 months before federal prohibition of sale of new automobiles). *See also United States Smelting, Ref. & Mining Co. v. Wigger,* 684 P.2d 850 (Alaska 1984) (gold mined under lease for 31 years before fixed price of gold made operation unprofitable).

exactness, without reliance on opinion or discretion." *Hansen v. Rothaus,* 107 Wn.2d 468, 472, 730 P.2d 662 (1986).

In *Hansen* this court noted that prejudgment interest awards are based on the principle that a defendant should be charged interest upon money retained by that defendant which should be paid to another. A party should be compensated for the "use value" of money representing damages for the period from date of loss to the date of judgment. *Hansen,* at 473.

Here, the sums were *paid to the Trust by the Growers* and held by the Trust throughout the course of this litigation. The Trust has had the use of the Growers' funds for more than 3 years. There is no dispute about the amounts. They are liquidated sums certain. Prejudgment interest was properly awarded by the trial court.

We affirm the Court of Appeals and adopt the Restatement (Second) of Contracts doctrine of supervening frustration.

We also affirm the trial court's award of prejudgment interest because the amounts in question are liquidated damages.

CALLOW, C.J., UTTER, DOLLIVER, DORE, PEARSON, ANDERSEN, and DURHAM, JJ., and HAMILTON, J. Pro Tem., concur.