[No. 47433-8.   En Banc.   December 10, 1981.]

WEYERHAEUSER REAL ESTATE COMPANY, *Respondent*, v. STONEWAY CONCRETE, INC., *Petitioner*.

*John F. Kovarik* (of *Casey, Pruzan & Kovarik*), for petitioner.

*Stafford, Frey & Mertel* and *A. Richard Dykstra,* for respondent.

HICKS, J.—Petitioner, Stoneway Concrete, Inc., seeks reversal of a divided Court of Appeals decision which overturned the judgment of the trial court and ordered Stoneway to remit to Weyerhaeuser Real Estate Company additional rental payments under a mineral lease executed by these parties. *Weyerhaeuser Real Estate Co. v. Stoneway Concrete, Inc.,* 26 Wn. App. 882, 614 P.2d 249 (1980). We reverse the Court of Appeals and reinstate the judgment of the trial court as modified.

The findings of fact entered by the trial court were unchallenged in the Court of Appeals and are verities here. On September 15, 1969, the parties entered into a 9-year mineral lease for the strip mining of sand and gravel on a tract of Weyerhaeuser land in south King County. The lease, which became effective January 1, 1970, provided for a basic minimum rental of $10,000 per year for the first 2 years and a minimum of $25,000 per year for each year thereafter. The lease further provided:

> This basic minimum annual rental shall be due and payable irrespective of whether Lessee produces any minerals from the leasehold.

The parties were aware that many permits and considerable preliminary site work would be required before actual strip mining could commence. Stoneway promised to seek the necessary permits and agreed to strictly comply with all applicable zoning regulations. In return, Weyerhaeuser promised, *inter alia,*

> to assist Lessee at all times in securing and maintaining such rezonings, zoning classifications and/or zoning permits as it may require for its contemplated operations hereunder.

Weyerhaeuser also promised to help Stoneway in obtaining pollution control permits as they may be required. Stoneway was given the option to terminate the lease as of the end of any contract year by giving 1 year's notice if in

Stoneway's "reasonable judgment the mining operations contemplated hereby have become uneconomical."

The mining operations required an unclassified use permit from King County, which Weyerhaeuser was to procure. The county planning department recommended to the council that a conditional permit be issued. Over public opposition, the King County Council granted the permit. There followed a referendum against the permit's issuance.

During litigation regarding the permit and referendum, Stoneway continued seeking other necessary permits. In April of 1971, Stoneway accused Weyerhaeuser of reneging on its obligation to assist in obtaining the necessary permits and for that reason paid no further rental installments. Stoneway, however, continued to participate in the litigation with its attorney carrying the major burden of it. This court ultimately resolved the litigated issues substantially in favor of the position of Stoneway and Weyerhaeuser. *Durocher v. King County,* 80 Wn.2d 139, 492 P.2d 547 (1972).

In the interim, the State Environmental Policy Act of 1971 (SEPA) became law, and a further lawsuit under that act regarding the unclassified use permit was filed and certified as a class action. At trial, the question was again resolved in favor of granting a permit; an appeal to this court was dismissed.

By January 1975, it was apparent that either the State Department of Ecology, King County, or both, on one ground or another, were going to require an environmental impact statement. The minimum cost of such a statement was estimated to be $35,000 with no assurance of the result that would follow even from a statement favorable to the project. In mid–1975, because of the costs anticipated and the uncertainty of the final result, Stoneway abandoned the project. It had conducted some site operations (test borings) but had extracted no minerals in quantity.

Weyerhaeuser commenced this lawsuit in January 1976. Stoneway raised several affirmative defenses, all refused by the trial court except one. The trial court held that Stone-

way had sustained the defense of commercial frustration and should be relieved of its obligations under the lease as of January 1, 1972, the outside limit of time that the parties had expected it might take to obtain the necessary permits.

A divided Court of Appeals reversed. *Weyerhaeuser Real Estate Co. v. Stoneway Concrete, Inc., supra.* The majority held that the doctrine of commercial frustration did not apply to the case because (1) the parties had agreed upon a remedy in the event the project became economically unfeasible, and (2) the payment of rent was not conditioned on Stoneway's success in extracting minerals from the site. We agree with the dissenting voice of the Court of Appeals, and hold that the trial court was correct on the issue of frustration.

■ The doctrine of commercial frustration may be summarized as follows:

> Where the assumed possibility of a desired object or effect to be attained by either party to a contract forms the basis on which both parties enter into it, and this object or effect is or surely will be frustrated, a promisor who is without fault in causing the frustration, and who is harmed thereby, is discharged from the duty of performing his promise unless a contrary intention appears.

Restatement of Contracts § 288, at 426–27 (1932). *See also* 18 S. Williston, *Contracts* § 1954 (3d ed. 1978); 6 A. Corbin, *Contracts* §§ 1355, 1356 (1962).

There can be no doubt of the desired object or purpose of Stoneway in entering the mineral lease with Weyerhaeuser. Nor is there any question that the purpose of Stoneway forms the basis on which both parties entered the lease.

The trial court's finding of fact No. 3 states:

> At all times material prior to the execution of the lease and subsequent thereto, defendant was engaged in the production and sale of sand, gravel and other aggregates and materials, and in the sale of concrete and various asphalt mixes. Prior to the lease, defendant's source of materials had diminished to a considerable extent, and it was in need of an extensive deposit of materials of this

kind. *Studies which the plaintiff has made* and which had been reviewed by the defendant indicated that the property of plaintiff, a tract of some 508 acres situated near Soos Creek in southern King County, would provide an excellent source for such materials.

(Italics ours.)

That Stoneway's purpose of obtaining sand, gravel and other aggregates by strip mining the leased premises was frustrated by its inability to obtain the necessary permits is unchallenged. Stoneway was without fault in the occurrence of the supervening event causing the frustration of its purpose. There remains only the question of whether the parties contemplated the possibility of nonissuance of required permits and provided for that contingency in the lease, thereby allocating that risk to one party or the other.

The parties appear to be in agreement that disposition of this case turns on whether the frustrating event was foreseeable. If the supervening event which frustrates the purpose forming the basis of the lease was, or should reasonably have been, foreseen by the parties and there is no provision in the lease concerning it, then an inference that the risk was assumed by the promisor is justified. *Lloyd v. Murphy*, 25 Cal. 2d 48, 153 P.2d 47 (1944) (per Traynor, J.); S. Williston, *supra* § 1954, at 135–36.

Here, the parties differ as to the identity of the supervening event which frustrated Stoneway's purpose. Weyerhaeuser, contending that production of minerals was the object for which the lease was entered, argues that the need to procure permits was foreseen by the parties. Stoneway, on the other hand, contends that while the parties anticipated a possible lengthy application process, they did not foresee that permits would ultimately become impracticable if not impossible to obtain.

Contentions of both parties in this instance are apparently adequately supported by substantial evidence. While we were not favored with the report of proceedings in this matter, the positions argued by each of the parties are reflected to some extent in the trial court's findings. We

agree with Stoneway, however, that notwithstanding the parties' mindfulness at the inception of the lease that there was a need to obtain a number of permits, the unanticipated occurrence which frustrated Stoneway's purpose in entering the lease was the public's massive outpouring of negative reaction to the proposed mining operation.

The onset of the so–called environmental movement resulted in unprecedented public outcry and opposition to this strip–mining project. The enactment by the legislature of RCW 43.21C, SEPA, encouraged continued resistance to this proposed land use and further motivated opponents of the project to persist in seeking to impede or prevent its implementation through the litigation process. All these events were unforeseeable at the inception of the lease.

The trial court's finding of fact No. 24 reads as follows:

> The Court finds that, although the parties contemplated and were fully aware of the necessity of obtaining permits from the regulatory agencies involved and that this process might require as much as two years, the parties were not aware of and did not contemplate the public outcry that was heard when news of the project reached the public in the summer of 1970. Weyerhaeuser particularly had prepared itself and had attempted to prepare the public in every way that it could for what can be described as a showcase of industrial development with proper environmental concern. The parties did not anticipate and were not prepared for the objection and the extensive litigation which followed the initial granting of the unclassified use permit. The unanticipated circumstance made performance of the contract vitally different from what was reasonably to be expected by the parties when the lease was entered into.

The parties simply did not anticipate the flood of environmental legislation and litigation that ensued shortly following the execution of the instant lease and which motivated environmentalists to adamant opposition to projects of this type. Even if the parties did foresee a lengthy permit application process, there is no indication that they could, or did, anticipate the response of the public.

We do not believe that the parties allocated the risk

of the result of such public opposition by the clause in the lease which provided for a minimum annual rental "irrespective of whether Lessee produces any minerals from the leasehold." We believe that the purpose of that provision is to discourage idleness and procrastination when it is permissible to mine, not to allocate the risk of nonissuance of permits. As the dissenting judge of the Court of Appeals stated:

> That language is not uncommon in mining leases. Its purpose is often "to insure a steady income to the lessor and to spur the lessee into a prompt and diligent development and operation of the property." 28 A.L.R.2d at 1015–16.

*Weyerhaeuser Real Estate Co. v. Stoneway Concrete, Inc., supra* at 890–91 (Dore, J., dissenting). The early case of *Adams v. Washington Brick, Lime & Mfg. Co.,* 38 Wash. 243, 248–49, 80 P. 446 (1905), in essence reached a like conclusion in response to a similar argument by a lessor.

As the trial court's findings are unchallenged, they are verities in this case. They lead to the conclusion that Stoneway was commercially frustrated in this instance. We agree with the trial court that it would be inequitable to cast upon Stoneway the entire risk of the commercial frustration of its purpose under this lease caused by the unanticipated circumstances described in the trial court's findings of fact. We hold that the trial court was correct in relieving Stoneway pro tanto of its obligations under the lease with Weyerhaeuser.

We are, however, of the view that the date upon which Stoneway was relieved by the trial court of its obligations should be modified. We consider the following facts:

1. Stoneway stopped rental payments in April 1971, even before the end of the first 2–year period. Finding of fact No. 17.

2. Nonetheless, "[n]either party . . . seemed willing to declare the lease of no further force and effect, and both continued with the litigation then pending . . ." Finding of fact No. 17.

3. Stoneway carried the major burden, as between the two parties in the various lawsuits. Finding of fact No. 18.

4. Stoneway abandoned the project in mid–1975, an action which the trial court found "reasonable and prudent." Findings of fact Nos. 23 and 25.

We hold that the "prudent" abandonment of the lease by Stoneway in mid–1975 should be the event which terminates its obligation under the lease. We agree with the trial court that at the time of entering the lease the parties anticipated no delay beyond January 1, 1972, in obtaining all required permits. Stoneway, however, continued under the lease after that date. Thus, while we hold that an unforeseeable supervening event caused commercial frustration of Stoneway's purpose in entering the mineral lease, Stoneway itself fixed the time when that frustrating event justified termination of its obligations under the lease. By continuing under the lease for more than 3 years beyond January 1972 before it abandoned the project, we believe subjects Stoneway to the obligations of the lease for that period of time. The 1–year notice provision of intention to terminate for economic reasons is inapplicable.

The Court of Appeals is reversed and the case is remanded to the trial court for entry of its judgment as modified herein.

It is so ordered.

ROSELLINI and WILLIAMS, JJ., and HAMILTON, J. Pro Tem., concur.

DOLLIVER, J., concurs in the result.

STAFFORD, J. (dissenting)—I agree the crucial question is whether the inability to obtain the necessary permits was foreseeable.

The majority concedes the parties could foresee some difficulty in obtaining the permits for strip mining. It was deemed unforeseeable, however, that there would be such a degree of public outcry or that continued resistance would be encountered by the enactment of RCW 43.21C (SEPA).

Reduced to its lowest common denominator, the majority holds that, although the parties clearly understood the permits might be *difficult* to obtain, they were unable to foresee that the strip–mining venture might prove *impossible* because of hostile public reaction and legal opposition. This is specious reasoning. Although it is acknowledged the parties knew the necessary permits might be *difficult* to obtain, the majority excuses noncompliance with the agreement merely because it believes the parties could not foresee the *degree* of difficulty to be encountered.

It is well known that public sentiment is both fluid and changeable. Thus, I find it difficult to accept as excusatory the assertion that one or both parties misjudged that public sentiment. Arguably, the only real event that might be deemed unforeseeable was the passage of SEPA which laid down stringent environmental rules. Yet, the new law did not, in and of itself, doom the project.

The majority has merely asserted an excuse, rather than providing a legal reason, for vitiating an otherwise valid agreement.

For the above reasons I respectfully dissent.

BRACHTENBACH, C.J., and UTTER and DIMMICK, JJ., concur with STAFFORD, J.

Reconsideration denied January 22, 1982.