# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

|  |  |  |
|---|---|---|
| GLOBAL CHEMICAL SOLUTIONS, LLC, a Washington limited liability, company, | ) ) ) ) | No. 74805-0-I |
|  | ) | DIVISION ONE |
| Respondent, | ) ) |  |
| v. | ) ) |  |
| CENTECH, LLC, a Washington limited liability company; JOHN GRAFF and TERESA GRAFF, husband and wife, and the marital community comprised thereof, | ) ) ) ) ) ) ) | UNPUBLISHED  FILED: <u>October 2, 2017</u> |
| Appellants, | ) ) |  |
| and | ) ) |  |
| ROBERT BLACK and MICHIKO BLACK, husband and wife, and the marital community comprised thereof, | ) ) ) ) ) |  |
| Defendants. | ) ) |  |

Cox, J. — Centech LLC, John Graff and Teresa Graff appeal the superior court's nunc pro tunc order entering judgment on a jury verdict in favor of Global Chemical Solutions, LLC (GCS) after a 12-day jury trial. The trial court did not abuse its discretion in refusing Centech's requested jury instructions on warranty and frustration of purpose. Moreover, the trial court's award of prejudgment interest was justified because the amount of damages awarded by the jury did

not require opinion or discretion. Finally, the trial court did not abuse its discretion in refusing to offset the damages award against Centech by the amount of a settlement agreement between GCS and another defendant, Robert Black. Accordingly, we affirm.

GCS was a chemical distribution company owned by Greg Porter, John Hennesy, and Black. Black was president of GCS and responsible for the day to day operations of the business. Hennessey had arranged for a revolving line of credit (LOC) that was personally guaranteed by him and Porter. Centech was a company dealing in glycerin byproducts, owned by its CEO, John Graff.

In 2011, friction developed between GCS's owners over GCS's failure to perform up to expectations and its increasing debt. Hennessy and Porter were dissatisfied with some of Black's decisions and actions and disputed Black's contention that the LOC was a loan instead of a capital contribution.

Graff and Black decided to go into business together, and negotiated with Hennessy and Porter to purchase the assets of GCS. Black would resign as president of GCS and become president and 50 percent owner of Centech.

In December 2012, GCS and Centech executed an Asset Purchase and Sale Agreement (the "APA"). Pursuant to the APA, GCS agreed to sell and assign to Centech all of its assets including inventory and accounts receivable. Centech agreed to assume all of GCS's accounts payable and expenses incurred in the ordinary course of business except the LOC.

Section 2.2 of the APA governs calculation of the final purchase price, and it sets a maximum price of $1.026 million. Graff had previously identified various

2

items listed as assets on GCS's books as "questionable," and these "Questionable Assets" are identified in section 2.2 of the APA. In the APA, the sum total of the Questionable Assets together with some other contingencies were deducted from the maximum purchase price to arrive at a "Provisional Purchase Price" of $898,880.

The final purchase price depended upon the Purchase Price Adjustment. The Purchase Price Adjustment would be determined based on a number of factors including whether Centech was able to collect the Questionable Assets, Centech's post-closing inventory sales, and its sales of new products provided by GCS's key supplier. The final purchase price would be set on July 31, 2013, the "true-up" date. On that day, the Purchase Price Adjustment would be applied to the provisional purchase price to determine the final purchase price. The final purchase price could not exceed $1.026 million.

Centech made a cash down payment and gave GCS a promissory note for the remainder with Graff and Black each specified as 50 percent personal guarantors.

Initially Centech made regular payments on the promissory note and Graff sent Porter monthly sales reports as required by the APA. Relations between Black and Graff began to break down until Centech ended up firing Black.

In July 2013, shortly before the true-up date, Graff wrote to Porter, accusing him and GCS of fraudulently misrepresenting the validity/collectability of the Questionable Assets and of withholding information about Black's dishonesty

3

and bad character. Graff claimed that Centech was entitled to a deeply discounted final purchase price, but Porter did not agree.

After making some reduced payments, Centech stopped making any payments on the Promissory Note by July 2014. GCS sued Centech for breach of the APA, and sued Black and Graff for breach of their personal guaranties.

GCS settled with Black, and proceeded to trial against Centech and Graff. Centech and Graff claimed they were fraudulently induced to enter into the APA. They claimed GCS misrepresented the value and collectability of its assets, and had they known how Black treated his partners, that he couldn't meet sales goals, that he demanded extortion money and that he twisted their deal, Centech and Graff never would have entered into the APA and Graff would not have signed the guarantee.

In response, GCS argued that Graff had thoroughly examined its books and records, used what he learned to negotiate favorable terms in the APA, and had ample evidence of Black's dealings before entering into business with him.

After a 12-day trial, the jury found in favor of GCS on all counts; it rejected Centech and Graff's claims that they were induced by fraud or negligent misrepresentation. The jury found Centech liable for $453,837 before interest and attorney fees. It found that Graff's personal guarantee for 50 percent of Centech's payment obligations was enforceable.

The trial court entered the final, clarified judgment including prejudgment and post-verdict interest, costs and attorney fees totaling a judgment of $922,455.12 against Centech and $528,738.16 against Graff.

Centech and Graff appeals.

## JURY INSTRUCTIONS

Centech argues that the trial court abused its discretion in refusing to instruct the jury on warranty and what Centech considers to be other "necessary definitions under the applicable law." We disagree.

Jury instructions are sufficient when they allow a party to argue their theory of the case, are not misleading, and when read as a whole "properly inform the trier of fact of the applicable law."[1] As long as these conditions are met, no more is required, and the trial court may refuse to give augmenting instructions or instructions that are cumulative, collateral, or repetitive.[2] The trial court may not give any instruction that is not supported by the evidence, and "[t]he evidence must raise more than a mere possibility before a theory can be submitted to the jury."[3]

Whether a jury instruction reflects an accurate statement of law is reviewed de novo.[4] But "[t]he number and specific language of the instructions are matters left to the trial court's discretion."[5]

Centech claims that additional instruction was necessary on "contract construction or interpretation," because otherwise the jury was left to "guess

---

[1] Bodin v. City of Stanwood, 130 Wn.2d 726, 732, 927 P.2d 240 (1996).
[2] Id.; Havens v. C & D Plastics, Inc., 124 Wn.2d 158, 165-66, 876 P.2d 435 (1994).
[3] Glenn v. Brown, 28 Wn. App. 86, 88, 622 P.2d 1279 (1980) (quoting Bd. of Regents of Univ. of Washington v. Frederick & Nelson, 90 Wn.2d 82, 86, 579 P.2d 346 (1978)); see State v. Benn, 120 Wn.2d 631, 654, 845 P.2d 289, cert. denied, 510 U.S. 944, 114 S. Ct. 382, 126 L. Ed. 2d 331 (1993).
[4] Joyce v. Dep't of Corrs., 155 Wn.2d 306, 323, 119 P.3d 825 (2005).
[5] Leeper v. Dep't of Labor & Indus., 123 Wn.2d 803, 809, 872 P.2d 507 (1994) (quoting Douglas v. Freeman, 117 Wn.2d 242, 256-57, 814 P.2d 1160 (1991)).

about the law applicable to the language of a complex APA." It argues that "determining the meaning of a contract is a responsibility for the judge, applying settled rules of construction."

Here, the trial court instructed the jury as to the definition of a contract and the meaning of a material breach, and it reviewed Centech's defenses and affirmative defenses. It instructed the jury on GCS's burden to prove breach, and Centech's burden to prove its affirmative defenses. Moreover, the trial court instructed the jury on how to interpret the APA by instructing it:

> to give effect to the intent of the parties at the time they entered the contract, . . . to take into consideration all the language used in the contract, giving to the words their ordinary meaning, unless the parties intended a different meaning, . . . to determine the intent of the contracting parties by viewing the contract as a whole, considering the subject matter and apparent purpose of the contract, all the facts and circumstances leading up to and surrounding the making of the contract, the subsequent acts and conduct of the parties to the contract, and the reasonableness of the respective interpretations offered by the parties.[6]

These instructions correctly stated the law applicable to a breach of contract action because they adequately explained the applicable law, they were not misleading, and they allowed the parties to argue their theories of the case.[7]

Centech argues that the jury needed clear instructions on what a warranty is, that proof of scienter or intent is not needed on a breach of warranty claim, and what the particular warranty clause in the APA entailed. It argues that the trial court abused its discretion in refusing to give an instruction that repeated the exact language set out in section 4 of the APA on the "Representations and

---

[6] Clerk's Papers at 333; 6 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL 301.05 (6th ed. 2012).

[7] Bodin, 130 Wn.2d at 732.

6

Warranties of the Seller," even though the jury was provided with a copy of the APA, including the warranty provisions. These arguments are unpersuasive.

First, as noted by the trial court, it would have been inappropriate to give another definition of warranty when the APA already defined that term. Moreover, these proposed instructions merely augmented the instructions the trial court decided to give and were potentially confusing to the jury.[8]

Centech relies on Mega v. Whitworth College, as support for its contention that additional instructions were necessary.[9] But in that case the appellate court only affirmed the trial court's own determination that it had erred when it instructed the jury on contract interpretation by allowing the jury to interpret and apply extrinsic evidence, in the form of an earlier letter, to an employment contract.[10] After trial, the trial court had determined as a matter of law that the contract should be interpreted without resorting to extrinsic evidence, and ordered a new trial on that basis.[11] On appeal, this court gave "great deference . . . to the trial court's decision to grant a new trial," because a "tenable basis exist[ed] for the court's new trial order."[12]

Here, unlike in Mega, the trial court did not decide that it had erroneously instructed the jury on a matter of law. Because the instructions given satisfactorily explained Washington law in a manner that allowed any reasonable jury to decide the issues before it, the trial court did not abuse its discretion in

---

[8] Id. at 732; Havens, 124 Wn.2d at 165-66.
[9] 138 Wn. App. 661, 670, 158 P.3d 1211 (2007).
[10] Id. at 672.
[11] Id.
[12] Id.

7

refusing to include Centech's instructions as unnecessary and potentially confusing to the jury.[13]

Finally, Centech argues that the jury should have been instructed on the defense of frustration of purpose because "one of its obligations under the contract, hiring Mr. Black as head of sales, made it impossible to even begin to perform the other obligations." We again disagree.

First, Centech cites to no authority in support of its contention that the trial court erred in refusing this proposed instruction so we need not consider the merits of this contention.[14] In any event, Centech is wrong on the merits as well.

The doctrine of frustration is applicable:

> [w]here, after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged, unless the language or the circumstances indicate the contrary."[15]

If the supervening event that frustrated the purpose of the contract "was, or should reasonably have been, foreseen by the parties" and there is no provision in the contract "then an inference that the risk was assumed by the promisor is justified."[16]

---

[13] Barnett v. Sequim Valley Ranch, LLC, 174 Wn. App. 475, 492-93, 302 P.3d 500 (2013).

[14] See DeHeer v. Seattle Post-Intelligencer, 60 Wn.2d 122, 126, 372 P.2d 193 (1962); King Aircraft Sales, Inc. v. Lane, 68 Wn. App. 706, 717, 846 P.2d 550 (1993).

[15] Wash. State Hop Producers, Inc., Liquidation Trust v. Goschie Farms, Inc., 112 Wn.2d 694, 700, 773 P.2d 70 (1989) (quoting Restatement (Second) of Contracts § 265 (1979)).

[16] Weyerhaeuser Real Estate Co. v. Stoneway Concrete, Inc., 96 Wn.2d 558, 563, 637 P.2d 647 (1981).

The trial court refused to instruct the jury on the defense of frustration of purpose because, although the APA specified that Black would join Centech, there was insufficient evidence to show that his failure to perform in that role would support the defense of frustration of purpose as a matter of law.[17]

Centech produced no evidence that Black's failure to perform once he joined Centech was unforeseeable nor that his adequate performance was "a basic assumption on which the contract was made."[18] To the contrary, Black's failure was foreseeable because both Graff and Porter testified that Graff knew about the alleged misrepresentations and malfeasance concerning Black.

For example, during the negotiations leading up to the APA, Graff learned that Black was making misrepresentations and last-minute demands. Before executing the APA, Porter had discovered that Black had revised GCS's financial statement, moving the LOC from "current liabilities" to "paid in capital." A loan officer and Porter alerted Graff that Black had improperly altered GCS's financial statements.

Also, shortly before the parties were due to finalize the purchase and sale, Black demanded payment in order to release all claims he had as an owner of GCS even though he had previously agreed to sign the release without consideration. Graff had also learned that Black had used GCS funds to pay his personal attorney and that Black had only agreed to go forward if Porter and Hennesy agreed to ratify this use of personal funds.

---

[17] See Goschie Farms, 112 Wn.2d at 704.
[18] 6 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL 302.10 (6th ed. 2012).

9

Despite the erroneous financial statement, Black's demand for a release payment, and a caution from Centech's counsel about going into business with Black, Graff chose to proceed with the purchase and sale negotiations. He never asked Porter or Hennessy anything about Black, and specifically told Porter that he did not want to know about Porter's problems with Black and their problems through GCS.

Based on Centech's failure to introduce evidence that warranted an instruction on the defense of frustration of purpose, the trial court did not abuse its discretion in refusing to instruct the jury on that theory.[19]

## SETOFF

Centech contends that the trial court abused its discretion in refusing to apply a $386,000 offset or setoff to the judgment against it. It claims that the trial court's reasoning for denying the setoff is unknown because it did not enter any findings of fact or conclusions of law. We disagree.

Under Washington law, the party who claims an offset has the burden of proving his or her claim.[20] In addition, a court does not need to apply an offset to any settlement amounts that have not been paid.[21]

This court reviews the trial court's decision on whether to grant an offset for abuse of discretion.[22]

---

[19] Weyerhaeuser Real Estate Co., 96 Wn.2d at 563.
[20] Harmony at Madrona Park Owners Ass'n v. Madison Harmony Dev., Inc., 160 Wn. App. 728, 735, 253 P.3d 101 (2011); Maziarski v. Bair, 83 Wn. App. 835, 841, 924 P.2d 409 (1996).
[21] See Brewer v. Fibreboard Corp., 127 Wn.2d 512, 532, 901 P.2d 297 (1995).
[22] Eagle Point Condo. Owners Ass'n v. Coy, 102 Wn. App. 697, 701, 9 P.3d 898 (2000).

As part of the APA, both Graff and Black signed guarantees for 50 percent of any liability imposed on Centech. Before trial, GCS settled with Black who agreed to pay $225,000 over 36 months at 5 percent interest. The obligation to pay this $225,000 amount was secured by a deed of trust on Black's home. The settlement was also secured with a confession of judgment for $386,000, which in turn was coupled "with a covenant not to execute except in the event of a default in payment." The confession of judgment included a 10-day right to cure provision.

In response to GCS's motion for entry of judgment, Centech requested a setoff against the verdict of $386,000 in light of Black's confession of judgment, claiming that otherwise a double recovery would result. GCS explained that the settlement amount was $225,000 while the $386,000 confession of judgment was contingent because it would only be executed upon if Black defaulted on the settlement agreement and failed to cure that default within ten days.

The trial court agreed with GCS and refused to apply any setoff.

Centech characterizes the settlement with Black as an amount "recovered" by GCS, and an amount that GCS "received" from Black, and claims that a setoff is necessary to prevent double recovery. But as of the date that Centech requested a setoff, Black had not yet paid any of the settlement amount. Moreover, although Centech claims there is no evidence that GCS will not collect that amount, it previously conceded that Black was unlikely to make payment on the amount owed.

In support of its argument that setoff was warranted before Black paid, Centech cites to <u>Coulter v. Asten Group, Inc.</u>, claiming that in that case the trial court applied the full amount of a setoff against the concurrent liability of other liable parties, even though the settlement amount had yet to be paid.[23] We are unpersuaded.

In <u>Coulter</u>, this court held that, in the absence of any evidence showing that the total settlement amount would not be paid, the trial court did not abuse its discretion in offsetting the judgment by the total value of the settlement agreement.[24] But the holding in <u>Coulter</u> affirming the trial court's decision to apply an offset before settlement funds were paid does not prove that a different result would be an abuse of discretion, especially when payment of the settlement funds appears unlikely.

GCS has agreed that, to the extent Black pays, Centech will be entitled to a partial satisfaction of the judgment against it. Until then, Centech is not entitled to offset the judgment by the amount of the settlement, and the trial court did not abuse its discretion in refusing to apply an offset to the judgment.[25]

Finally, Centech argues that because the trial court did not enter findings of fact and conclusions of law to support its decision to deny any offset, this court must remand so that the trial court can do so. Centech claims that such findings and conclusions are required by CR 52. Centech is wrong.

---

[23] 155 Wn. App. 1, 10-11, 230 P.3d 169 (2010).
[24] <u>Id.</u> at 12.
[25] <u>Brewer</u>, 127 Wn.2d at 532.

CR 52(a)(1) and (2) specify when the trial court must find the facts and specifically state its conclusions of law. CR 52(a)(5) states that findings of fact and conclusions of law are not necessary for decisions on motions, with certain exceptions not relevant here. Therefore we reject Centech's contention.

## PREJUDGMENT INTEREST

Centech claims that the trial court abused its discretion in awarding prejudgment interest because the amount of liability could not be determined before trial and required the exercise of opinion or discretion. We disagree.

Washington permits prejudgment interest for liquidated claims only.[26] "A 'liquidated' claim is a claim 'where the evidence furnishes data which, if believed, makes it possible to compute the amount with exactness, without reliance on opinion or discretion.'"[27] In contract cases, this means that prejudgment interest is allowed when the amount due "is determinable by computation with reference to a fixed standard contained in the contract."[28]

We review a trial court's decision on whether to award prejudgment interest for abuse of discretion.[29]

Centech notes that section 2.2 of the APA provides for certain adjustments to the purchase price depending on whether Centech was able to collect on certain accounts using "best collection efforts." It argues that, as of the

---

[26] Hansen v. Rothaus, 107 Wn.2d 468, 472, 730 P.2d 662 (1986).
[27] Id. (quoting Prier v. Refrigeration Eng'g Co., 74 Wn.2d 25, 32, 442 P.2d 621 (1968)).
[28] Prier, 74 Wn.2d at 32.
[29] Scoccolo Const., Inc. ex rel. Curb One, Inc. v. City of Renton, 158 Wn.2d 506, 519, 145 P.3d 371 (2006).

13

true-up date, July 31, 2013, GCS was challenging whether Centech has used best collection efforts, so the purchase price was unliquidated before trial.

As additional support for its argument, Centech notes that "the APA plainly requires GCS to adjust the purchase price down proportionately to the difference between the actual sales made by Centech and the Earn-Out Target." Finally, it notes that GCS conceded during trial that it had erred in calculating total sales and erroneously increased the putative purchase price by over $47,000. We are unpersuaded.

While there is a provision in the APA calling for Centech to use "best efforts" in collecting accounts receivables and selling inventory, that provision was never at issue during trial. Porter testified that GCS was not contesting whether Centech used best efforts, so there would be no testimony introduced on that issue. He also agreed that he would take Graff's word for the amount of unsold inventory and conceded that all the remaining questionable accounts receivable were uncollectible.

As to the Earn-Out Target, Porter agreed that there was a computational error because one of the accounts, Lucid Tech, was initially placed in both the accounts receivable column and the earn-out column. But, this was an accounting error that was easily corrected. Such an error does not prevent the claim from being liquidated.[30] After correcting the error, Porter applied the formula set forth in Section 2.2 of the APA and testified that the final amount owed was $453,837, the exact amount the jury awarded.

---

[30] Id. at 519-20; Prier, 74 Wn.2d at 33.

Accordingly, the trial court did not abuse its discretion in awarding prejudgment interest.

## ATTORNEY FEES

GCS requests an award of attorney fees on appeal. An award is proper, subject to its compliance with RAP 18.1.

"A contractual provision for an award of attorney's fees at trial supports an award of attorney's fees on appeal under RAP 18.1."[31]

The APA and Graff's guaranty provide for attorney fees to the prevailing party and the trial court awarded attorney's fees to GCS. Because the APA and guaranty provided for an award of attorney fees at trial, we grant GCS's request for attorney fees on appeal pursuant to RAP 18.1.[32]

We affirm. We grant GCS's request for fees on appeal, subject to compliance with RAP 18.1.

Cox, J.

WE CONCUR:

---

[31] Edmundson v. Bank of Am., 194 Wn. App. 920, 932-33, 378 P.3d 272 (2016).
[32] Id.

15