FILED
COURT OF APPEALS
DIVISION II

2013 APR 30 AM 8: 34

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

MARIE BARNETT, VICTOR GONZALEZ,
MARIO GONZALEZ, DAVID GONZALEZ,
and OCTAVIO GONZALEZ,

       Respondents,

  v.

SEQUIM VALLEY RANCH, LLC, a
Washington limited liability company; and
SEQUIM VALLEY LAVENDAR, a
Washington corporation; and STEPHEN
CLAPP, a single man,

       Appellant.

No. 41832-1-II

ORDER PUBLISHING OPINION

WHEREAS, the Court believes that the opinion in this case should be published, it is now

ORDERED, that the final paragraph, reading "A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record pursuant to RCW 2.06.040, it is so ordered." is deleted. It is further

ORDERED, that the opinion will be published.

DATED this 30ᵀᴴ day of APRIL , 2013.

PRESIDING JUDGE

FILED
COURT OF APPEALS
DIVISION II

2013 MAR -5 AM 9: 23

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| MARIE BARNETT, VICTOR GONZALEZ, MARIO GONZALEZ, DAVID GONZALEZ, and OCTAVIO GONZALEZ, | No. 41832-1-II |
| Respondents, | |
| v. | |
| SEQUIM VALLEY RANCH, LLC, a Washington limited liability company; and SEQUIM VALLEY LAVENDAR, a Washington corporation; and STEPHEN CLAPP, a single man, | UNPUBLISHED OPINION |
| Appellant. | |

QUINN-BRINTNALL, P.J. — A jury found that Sequim Valley Ranch, LLC (SVR) wrongfully discharged Marie Barnett, Victor Gonzalez, Mario Gonzalez, and Octavio Gonzalez in violation of public policy. The employees felt compelled to resign after SVR owner, Stephen Clapp, pressured them to give false or misleading testimony in a lawsuit Clapp was bringing against a neighboring dairy farm. SVR appeals the $427,230 jury award, arguing that (1) the statute of limitations barred the employees' constructive, wrongful discharge suit and the trial court erred in failing to grant SVR summary judgment on this issue; (2) the trial court erred in refusing to give a number of SVR's proposed jury instructions; and (3) substantial evidence does

not support the jury verdict. Because the employees' constructive, wrongful discharge suit was timely filed, and the trial court properly instructed the jury, we affirm.

## FACTS

BACKGROUND

Barnett, Victor, Mario, and Octavio[1] all worked for many years at SVR, a lavender farm and ranch owned by Clapp. Barnett served as SVR's bookkeeper and managed a "retail cottage" on the ranch selling lavender and lavender products. Victor ran the 700-acre ranch's extensive lavender farm while his brother, Mario, assisted with growing lavender and handling SVR's computer networking needs. Their nephew, Octavio, operated the lavender farm's machinery and maintained SVR's lavender fields. Clapp was not involved in SVR's day-to-day operations but had lived on the lavender farm part of each year since 1998. By 2004, SVR had become "the premier and best organized and equipped lavender operation in the United States." 2 Clerk's Papers (CP) at 364. That same year, however, relations between Clapp and his employees began to unravel.

In the spring of 2004, Clapp began asking SVR's employees to participate in a lawsuit against a neighboring dairy farm, Maple View Farms (Maple View). Clapp believed that Maple View was excessively fertilizing its property and that this practice constituted a health hazard and safety risk that threatened SVR's lavender business.[2] In gathering information for the lawsuit, Clapp asked Barnett to fill out a questionnaire about the "[e]ffect of [a] manure lagoon

---

[1] The Gonzalezes' first names are used for clarity. The trial court dismissed David Gonzelez's claims, seemingly without prejudice, at the conclusion of trial testimony. David does not raise dismissal of his claims in this appeal.

[2] Clapp filed suit against Maple View on July 2, 2004. The lawsuit was apparently dismissed for want of prosecution, although the record is unclear.

and spraying upwind of the Lavender Cottage in 2003." 2 CP at 321. Unsatisfied with Barnett's initial responses, Clapp changed the questionnaire multiple times and, according to Barnett, even kept "changing [her] answers."[3] Report of Proceedings (RP) (Jan. 4, 2011) at 54. In May 2004, Clapp explained in a cover letter to Barnett (sent with the third iteration of the questionnaire) that the questionnaire was "not a legal deposition at this point altho[ugh] when we do act to stop the spraying . . . we will have to take actual depositions from all employees who were here in the 2003 season." 2 CP at 315. Clapp's letter stressed that "we will likely need the true and strong support of the staff . . . in getting the injunctive relief done." 2 CP at 316. Barnett and the Gonzalezes did not share Clapp's concerns and worried that the lawsuit was meritless.

On September 9, Clapp had a meeting with Barnett and the Gonzalezes. Clapp discussed the situation with Maple View and the kinds of things he would expect the staff to attest to witnessing. When Clapp finished, Victor said, "Steve, if you don't explain [to] me what's going on here, I'm not going to court to lie." RP (Jan. 5, 2011) at 138. In response, Clapp yelled, "If you don't do that for me, you cannot work for me. I don't know why I'm fuckin[g] doing this," then stormed out. RP (Jan. 5, 2011) at 138. Later that day, Clapp sent a letter to all SVR staff members about the lawsuit against Maple View. The letter told employees that "[b]eing part of [a] ranch is a participatory sport, just like democracy" (2 CP at 342), and explained that

> [l]awyers will come up next week to ask you to attest to what I know you
> know to be true after 3 years of living in the shadow of this program, that the
> canon is left in the same parts of the field for hours on end. In the old west a

---

[3] For instance, the first version of the questionnaire asked, "Did the smell ever make you feel nauseous or appear to bother [your infant son]?" 2 CP at 321. Barnett responded that she had never noticed her son "having any reaction to" the smell and that it never made them ill. 2 CP at 318. Clapp later changed the question to read, "Are you comfortable with the airborne pathogens from the concentrated manure ejected from the manure canon blowing onto SVR property and possibly resulting in your 1 year old son being exposed?" 2 CP at 319.

ranch owner would ask his staff to saddle up and go after rustlers and other parties that were damaging the ranch. Nowadays we don't ask you to risk your lives, we handle it through the law and have it decided by judicial review. But as in the past all ranches have special expectations of their ranch hands to help protect the ranch. . . . [I]f you want to be part of a growing multi-functional modern ranch then you need to help the team that is presently fighting for it. Your part of the process is to give full, unequivocal and affirmative testimony to what you have been the closest witnesses of for 3 years. You need to decide before [the lawyers] come whether you consider yourself part of a ranch or whether you think you can find a better employer, pay, benefits, perks, flexibility and working conditions that call upon your skills and talents somewhere else on the Peninsula.

2 CP at 342-43.

On September 12, Clapp sent a "supplemental" letter to the SVR staff stating that he was "disturbed by resistance among some of you to helping us help you." 2 CP at 345. The supplemental letter also explained his expectations in more detail:

You are the best witnesses to the operation of the spraying and the lagoon and the truck dumping. You are the people that people would expect to be the most anxious to give testimony that would help stop this program from impinging on your workplace and health. *You needn't concern yourself that what you say may not be accurate or even that subsequently it might be proven false*; you are asked only to testify to what you believe to the best of your knowledge is true. You can only be held accountable (and rarely are) for statements that you know as a fact to be untrue [at] the time you made the statement. You cannot be held accountable for your opinion if it was what you believed to be true at the time you made the statement. If you state that you believe to the best of your knowledge that the canon remained in the same part of the field for as much as a half of a day at a time and you believe that to be true, you cannot be held accountable for that statement. . . . *If we find that you, being the witnesses the court would expect the most affirmative and full testimony from, that your equivocation or unwillingness to become involved on behalf of Sequim Valley Ranch damages the case our legal team has worked hard to build, then I will have to make the determination whether it is workable for me to run the ranch with staff that can't be counted on when the ranch really needs them.*

2 CP at 346 (emphasis added).

Despite their mounting concerns over Clapp's exhortations to have them participate in a lawsuit they considered meritless, Barnett and the Gonzalezes gave taped statements to Clapp's

attorneys on September 14. None of the statements contained information helpful for the Maple View litigation.[4] After thinking over the situation for the rest of the week, the four long-time employees tendered a single letter of resignation on Monday, September 20, 2004, noting that September 18 was their last day of work. The letter informed Clapp that

> [y]ou have made demands of all of us and threatened us with termination if we choose not to fulfill these demands. You have made several attempts to manipulate and misrepresent our statements of knowledge regarding your lawsuit against Maple [View] Farms and then accused us of resisting helping you when we were unable to supply you with damaging evidence to help your case. . . .
> . . . You have created an unstable, unhealthy and dangerous work environment. By asking us to commit perjury or be fired, you in affect [sic] Constructively Discharged us.

2 CP at 357.

Clapp responded on September 28 by sending a letter to the employees stating that he would not mail them their final paychecks unless they signed either (1) a statement that Clapp never asked SVR employees to lie but the employees quit because they were unsure if they wanted to be cooperative or supportive of the ranch or (2) a statement of the employees' intent to return to work and cooperate with the lawsuit. Clapp also indicated that the employees could pick up their paychecks from him personally if they were unwilling to sign statements (1) or (2) or chose to sign a third statement that included such language as "I believe Steve Clapp is [a] bad human being to have the temerity to ask me to help him save his home and the ranchhouse by testifying. . . . Tough for him if he loses his house and home. . . . Tough for him if he dies. I

---

[4] The manager of the nonlavender part of SVR, Tony Parks, also gave a statement. His statement noted one incident when Maple View's manure gun had a breakdown and leaked effluent onto the Clapp property but otherwise was consistent with Barnett's and the Gonzalezes' statements explaining that they were unaware of any over-fertilizing or health and safety hazards associated with Maple View.

don't care." 2 CP at 367. None of the employees signed the statements or returned to work for SVR.

PROCEDURE

On September 17, 2007, Barnett and the Gonzalezes filed a complaint against SVR for wrongful discharge in violation of public policy, alleging that SVR "expected and urged [them] to provide false or misleading testimony to support [SVR's] claims in a civil action against Maple [View] Farms as a condition of continuing employment. [Barnett and the Gonzalezes] had no reasonable choice but to resign . . . rather than to commit the crime of perjury." 5 CP at 1304.

SVR moved for summary judgment on November 2, 2009, arguing that the statute of limitations barred the employees' claims. Alternatively, SVR argued that the employees failed to state a cause of action because they voluntarily quit; SVR did not ask them to provide false testimony under oath; the working conditions at SVR were not "so intolerable that a reasonable person would have felt compelled to resign;" and the employees failed "to pursue internal procedures to contest the employer's unjustified employment actions." 5 CP at 1091, 1093.

The trial court denied SVR's summary judgment motion, ruling that under CR 8, SVR could not raise the statute of limitations issue because it failed to plead it in its answer and, even if it were allowed to raise the issue, the statute of limitations began running on the claim at the time the employees submitted their letter of resignation (September 20, 2004) and their suit was brought less than three years after that (September 17, 2007). The trial court also ruled that material facts were in dispute concerning the substance of the constructive discharge claim and, accordingly, summary judgment was inappropriate.

A jury trial began on January 4, 2011. Barnett and the Gonzalezes testified about the conditions on the ranch that led to their resignation and that their last day of work was September 18, 2004. They all testified that they felt their jobs were in jeopardy if they were unwilling to provide false or misleading testimony in the Maple View litigation. *See, e.g.*, RP (Jan. 5, 2011) at 24 (Clapp told Barnett to lie); RP (Jan. 6, 2011) at 31 (Clapp was "really pushing [Victor] to come to court and lie"); RP (Jan. 10, 2011) at 98 (Mario felt that he "had only one option, to say what [Clapp] was telling [him] to say or quit or lose" his job); RP (Jan. 10, 2011) at 162 (Clapp told Octavio he had to "say in court that [he] was getting sick from the manure that was spraying").

The employees also testified to the economic losses they suffered after leaving SVR. One of the lawyers who initially questioned the employees in 2004 testified for SVR that Barnett and Victor originally told him that Maple View's manure program was hurting business and possibly harming the employees' health but could not remember the date of the interviews and had no notes from the meetings. Another former SVR employee, Sales Manager Robert Fell, testified that the manure was a problem but also that he left SVR before the September events because he did not get along well with Barnett. Clapp did not testify.

On January 14, the jury returned its verdict, finding that SVR had constructively discharged Barnett and the Gonzalezes in violation of public policy. The jury awarded varying economic and noneconomic damages to the plaintiffs totaling $427,230. SVR timely appeals.

## DISCUSSION

### STATUTE OF LIMITATIONS

SVR first contends that the trial court erred in denying its motion for summary judgment and concluding that the employees' wrongful discharge claims were not barred by the statute of

7

limitations. Because SVR misinterprets controlling law on this issue and the employees' claims were brought within the three-year statute of limitations, we affirm.

We review an appeal from summary judgment de novo, performing the same inquiry as the trial court. *Hisle v. Todd Pac. Shipyards Corp.*, 151 Wn.2d 853, 860, 93 P.3d 108 (2004). Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c). We construe all facts and reasonable inferences in the light most favorable to the nonmoving party. *Vallandigham v. Clover Park Sch. Dist. No. 400*, 154 Wn.2d 16, 26, 109 P.3d 805 (2005) (citing *Atherton Condo. Apartment-Owners Ass'n Bd. of Dirs. v. Blume Dev. Co.*, 115 Wn.2d 506, 516, 799 P.2d 250 (1990)). Whether the statute of limitations bars a plaintiff's action is a legal question we review de novo. *Nieshe v. Concrete Sch. Dist.*, 129 Wn. App. 632, 638, 127 P.3d 713 (2005), *review denied*, 156 Wn.2d 1036 (2006).

A cause of action for wrongful discharge in violation of public policy is a tort claim and is subject to a three-year statute of limitations. *Danny v. Laidlaw Transit Servs., Inc.*, 165 Wn.2d 200, 207, 193 P.3d 128 (2008); RCW 4.16.080(2). The action may be based on "either express or constructive" discharge. *Snyder v. Med. Serv. Corp. of E. Wash.*, 145 Wn.2d 233, 238, 35 P.3d 1158 (2001) (citing *Riccobono v. Pierce County*, 92 Wn. App. 254, 263, 966 P.2d 327 (1998)); *see also Korslund v. DynCorp Tri-Cities Servs., Inc.*, 156 Wn.2d 168, 177 n.1, 125 P.3d 119 (2005) ("we find no compelling reason why the tort cannot be based on constructive discharge"). To establish constructive discharge, an employee must show that an employer engaged in a deliberate act, or a pattern of conduct, that made working conditions so intolerable that a reasonable person would have felt compelled to resign. *Sneed v. Barna*, 80 Wn. App. 843,

849-50, 912 P.2d 1035, *review denied*, 129 Wn.2d 1023 (1996). This is an objective standard and an "employee's subjective belief that he had no choice but to resign is irrelevant." *Travis v. Tacoma Pub. Sch. Dist.*, 120 Wn. App. 542, 551, 85 P.3d 959 (2004).

In support of its contention that the statute of limitations barred the employees' wrongful termination claim, SVR relies exclusively on its own interpretation of a single Washington case, *Douchette v. Bethel School District No. 403*, 117 Wn.2d 805, 818 P.2d 1362 (1991). Douchette collapsed on the job in January 1983, as a result of what she considered intolerable working conditions; she did not return to work and wrote a letter, received by her employer on February 16, specifying March 15 as the effective date of her resignation. *See Douchette v. Bethel Sch. Dist. No. 403*, 58 Wn. App. 824, 826, 795 P.2d 162 (1990), *aff'd*, 117 Wn.2d 805. Douchette did not return to work between February 16 and March 15. *Douchette*, 117 Wn.2d at 807. On March 17, 1986, she filed a wrongful discharge action for age-based discrimination in violation of state and federal law, civil rights, and the common law. *Douchette*, 117 Wn.2d at 808. The trial court found that a material question of fact existed as to whether Douchette's claims were time-barred. *Douchette*, 117 Wn.2d at 809.

Our Supreme Court accepted review of the *Douchette* case and ruled that Douchette's discharge became effective at the time she communicated her discharge to her employer.[5] The

---

[5] This court's *Douchette* decision may have created some confusion later perpetuated in the Supreme Court's *Douchette* opinion. Our decision twice discusses how Douchette's employer received her letter of resignation on February 16, but later in the opinion states that "Douchette's common law tort claim for constructive wrongful discharge had occurred no later than February 15 when she notified the School District that she was terminating her employment." *Douchette*, 58 Wn. App. at 828. Without reference to the discrepancy, the Supreme Court's opinion states that this court "concluded Douchette's claim accrued February 15, 1983." *Douchette*, 117 Wn.2d at 816.

court limited its holding to the specific facts of the case but noted that it found persuasive a United States Supreme Court opinion[6] holding that

> the discharge of an employee is effective the date the employer communicates notice of termination (or intent to terminate at a specific date), to the employee. We note that in a claim for constructive discharge, the date may be the date the employee gives notice to the employer or the last day of actual employment.

*Douchette*, 117 Wn.2d at 816 n.9.

Here, SVR argues that the statute of limitations should have begun to run "on the last date that the unlawful employment practice occurred—not on the date of the employee's resignation." Br. of Appellant at 19. SVR argues that this date should be September 14, 2004, "the day the Employee's [sic] were interviewed by SVR's counsel and the last day they were physically present at SVR and working." Br. of Appellant at 20. This argument is unpersuasive for a number of reasons.

First, on summary judgment, we construe all facts and reasonable inferences in the light most favorable to the nonmoving party. *Vallandigham*, 154 Wn.2d at 26. The letter of resignation Barnett and the Gonzalezes submitted states that their last day of employment was September 18. Accordingly, for purposes of reviewing SVR's summary judgment motion, we must accept September 18 as the last day the employees worked at the ranch.[7]

Second, SVR's argument that the employees were not, and could not have been, subjected to any further unlawful conduct by SVR after September 14 (the date that the employees provided statements to SVR lawyers for the Maple View lawsuit) is belied by Clapp's efforts on September 28 to get the employees to sign what amounted to hold harmless

---

[6] *Del. State Coll. v. Ricks*, 449 U.S. 250, 101 S. Ct. 498, 66 L. Ed. 2d 431 (1980).

[7] At trial, the employees all testified that they worked every day from September 14 to September 18. SVR presented no testimony or evidence countering this testimony.

agreements to receive their final paychecks. Although Clapp did not have direct contact with the employees after the September 9 meeting, nothing in the record reflects that had the employees failed to adequately assist in providing damning testimony for the Maple View claim, Clapp would not take action (which he had previously threatened) by firing the employees.

Last, the *Douchette* court itself indicates that the statute of limitations for a constructive discharge should begin accruing either (1) on the date the employee gives notice to her employer of her resignation or (2) on the last day the employee actually works. 117 Wn.2d at 816 n.9. Whether we look to the day the employees gave notice of their termination (September 20, 2004) or their last day of work (September 18, 2004), the employees clearly filed their wrongful discharge claim on September 17, 2007, within three years of the statute of limitations. Accordingly, SVR's claim that the statute of limitations barred the employees' wrongful discharge suit is meritless.

JURY INSTRUCTIONS

SVR argues that the trial court erred in failing to instruct the jury that in order for the employees to establish wrongful constructive discharge, they must prove that they had no other alternative but to quit and that the employees' resignations should be deemed voluntary if they failed to pursue internal procedures to contest SVR's unjustified employment actions. SVR also alleges that the trial court committed reversible error in instructing the jury on a public policy construction not recognized by Washington law and in refusing to provide instruction on the scope of the criminal statutes embodying the public policy the court identified. We disagree.

A.    STANDARD OF REVIEW

We review jury instructions de novo. *Cox v. Spangler*, 141 Wn.2d 431, 442, 5 P.3d 1265, 22 P.3d 791 (2000). Parties are entitled to jury instructions that accurately state the law. *Eagle*

11

*Group, Inc. v. Pullen*, 114 Wn. App. 409, 420, 58 P.3d 292 (2002), *review denied*, 149 Wn.2d 1034 (2003). Jury instructions are sufficient when they allow counsel to argue their case theories, do not mislead the jury, and, when taken as a whole, properly inform the jury of the law to be applied. *Blaney v. Int'l Ass'n of Machinists & Aerospace Workers, Dist. No. 160*, 151 Wn.2d 203, 210, 87 P.3d 757 (2004). Instructions that are merely misleading are not grounds for reversal unless they cause prejudice. *Keller v. City of Spokane*, 146 Wn.2d 237, 249, 44 P.3d 845 (2002).

> B.     THE TRIAL COURT'S "ELEMENTS" INSTRUCTION

SVR contends that the trial court's refusal to instruct the jury that the employees must prove that they had no alternative but to quit their jobs constituted error. Because the trial court's "elements" instruction clearly and correctly instructed the jury on Washington law, this argument is meritless.

The trial court instructed the jury that

> [c]onstructive discharge occurs when an employer deliberately creates working conditions so intolerable that a reasonable person in the shoes of the employee would feel compelled to resign. To establish constructive discharge, each plaintiff must prove the following:
> 1. That the defendant deliberately made working conditions intolerable for him/her;
> 2. That a reasonable person in his/her position would be forced to quit;
> 3. That he/she did quit because of the conditions and not for any other reason; and
> 4. That he/she suffered damage as a result of being forced to quit.

1 CP at 169.

Numerous Washington cases establish that these four elements are necessary for a wrongful constructive discharge claim. In *Haubry v. Snow*, 106 Wn. App. 666, 677, 31 P.3d 1186 (2001), for instance, Division One of this court explained that an employee "must prove

[her employer] deliberately made working conditions intolerable for her; that a 'reasonable person in her position' would be forced to quit; that she did quit because of the conditions and not for any other reason; and that she suffered damage as a result of being forced to quit" (quoting *Hill v. GTE Directories Sales Corp.*, 71 Wn. App. 132, 143, 856 P.2d 746 (1993)).

Here, SVR cites only *Molsness v. City of Walla Walla*, 84 Wn. App. 393, 928 P.2d 1108 (1996), to support its assertion that the trial court misstated the applicable law. But *Molsness* is distinguishable. In *Molsness*, the court stated that "'the record evidence supports [a] finding that plaintiff chose to resign . . . rather than challenge the validity of her proposed discharge for cause. The fact remains, plaintiff *had a choice*.'" 84 Wn. App. at 398 (quoting *Christie v. United States*, 207 Ct. Cl. 333, 518 F.2d 584, 587-88 (1975)). Unlike in *Molsness*, Barnett and the Gonzalezes did not face potential discharge for cause. They resigned because they felt—and overwhelming evidence in the record reflects—that they had no alternative but to resign their positions despite that SVR was thriving under their employ and management. Accordingly, SVR's claim lacks merit.

## C.    INTERNAL PROCEDURES INSTRUCTION

SVR also argues that the trial court erred in refusing to give an instruction stating that the employees' resignations would be deemed voluntary if the evidence showed that "'[Barnett and the Gonzalezes] failed to pursue internal procedures to contest any claimed employment actions . . . on which [they] base their claims.'" Br. of Appellant at 33 (quoting 3 CP at 560). But SVR failed to argue this at trial or to object to the trial court's decision to omit this instruction. Accordingly, it has failed to preserve this issue for review.

CR 51(f) requires that counsel object "to the giving of any instruction and to the refusal to give a requested instruction." We will only "consider a claimed error in a jury instruction . . .

13

if the appellant raised the specific issue by exception at trial." *Van Hout v. Celotex Corp.*, 121 Wn.2d 697, 702, 853 P.2d 908 (1993). Here, the record reflects that SVR did not object to the trial court's refusal to give its proposed instruction on "internal procedures." We conclude that this argument is not preserved for appellate review.

D. PUBLIC POLICY INSTRUCTION

SVR next contends that the trial court committed reversible error by instructing the jury on a public policy consideration that Washington courts do not recognize and by refusing to provide instruction regarding the scope of the criminal statutes embodying the public policy the court identified. We disagree. Washington law clearly discourages interfering "with the process of obtaining truthful testimony, either oral or written, in any official proceeding either by threats, intimidation, coercion or inducement," and further instruction on the specific criminal statutes that embody this public policy was unnecessary. 1 CP at 165 (Instruction No. 12).

Whether an employer violates public policy in wrongfully discharging an employee "is narrow and should be 'applied cautiously.'" *Danny*, 165 Wn.2d at 208 (quoting *Sedlacek v. Hillis*, 145 Wn.2d 379, 390, 36 P.3d 1014 (2001)). In determining whether a clear mandate of public policy is violated, courts ask "'whether the employer's conduct contravenes the letter or purpose of a constitutional, statutory, or regulatory provision or scheme.'" *Thompson v. St. Regis Paper Co.*, 102 Wn.2d 219, 232, 685 P.2d 1081 (1984) (quoting *Parnar v. Americana Hotels, Inc.*, 65 Haw. 370, 380, 652 P.2d 625 (1982)). Washington courts have specifically held that a wrongful termination in violation of public policy occurs

> (1) where employees are fired for refusing to commit an illegal act; (2) where employees are fired for performing a public duty or obligation, such as serving jury duty; (3) where employees are fired for exercising a legal right or privilege, such as filing workers' compensation claims; and (4) where employees are fired in retaliation for reporting employer misconduct, *i.e.*, whistleblowing.

14

*Gardner v. Loomis Armored Inc.*, 128 Wn.2d 931, 936, 913 P.2d 377 (1996).

Here, SVR argues that "Washington law does not support a public policy tort based on a claim that the employer acted unlawfully and an employee voluntarily quits in response." Br. of Appellant at 37. Essentially, SVR argues that even if Clapp committed criminal or quasi-criminal conduct by attempting to coerce Barnett and the Gonzalezes to lie to improve his case against Maple View, his actions did not violate a public policy because he did not fire the employees for their refusal to commit an illegal act.

The record belies this claim: although litigation had not yet proceeded to the point that actual sworn depositions were being taken, Clapp's memoranda clearly stated that he expected that such official proceedings would occur in the future. Accordingly, the only reasonable conclusion that can be drawn from Clapp's frequent and insistent exhortations to employees to discuss over-fertilization on the Maple View property is that employees would be fired for "refusing to commit an illegal act," perjury. *Gardner*, 128 Wn.2d at 936. Moreover, under SVR's logic, Washington law would never recognize a *constructive* discharge claim in violation of public policy. Our Supreme Court, however, has rejected such arguments. *Korslund*, 156 Wn.2d at 177 n.1 ("we find no compelling reason why the tort cannot be based on constructive discharge").

SVR also argues that the trial court erred in refusing to instruct the jury on the statutory definitions of witness tampering, witness intimidation, or perjury. But further instruction on the public policy issue at stake—discouraging interfering with the process of obtaining truthful testimony, either oral or written, in any official proceeding either by threats, intimidation, coercion, or inducement—was unnecessary and could have created undue confusion for the jury.

The trial court's instructions allowed SVR to argue its case theory, did not mislead the jury, and, when taken as a whole, properly informed the jury of the applicable law. *Blaney*, 151 Wn.2d at 210. We presume that "a jury, in exercising its collective wisdom, is expected to bring its opinions, insights, common sense, and everyday life experience into deliberations." *State v. Briggs*, 55 Wn. App. 44, 58, 776 P.2d 1347 (1989). This was not a criminal trial related to the crimes of perjury, witness tampering, or witness intimidation. This was a trial related to wrongful termination. The trial court's instructions, as a whole, clearly articulated the elements of the tort claim and its statement of the applicable public policy satisfactorily distilled Washington law in a manner that allowed any reasonable juror to decide the issue. Accordingly, we hold that SVR's instructional challenges lack merit.

SUBSTANTIAL EVIDENCE

Finally, for the first time on appeal, SVR argues that substantial evidence does not support the jury's verdict because the employees failed to establish a prima facie case of wrongful discharge in violation of public policy. SVR contends that the plaintiffs had to show that "other means of promoting the public policy are inadequate and that the actions plaintiff[s] took were 'the only available adequate means' to promote the policy." Br. of Appellant at 47 (quoting *Cudney v. ALSCO, Inc.*, 172 Wn.2d 524, 530, 259 P.3d 244 (2011)). But SVR did not argue or request instructions on this point at trial. Accordingly, this argument is not preserved for our review. RAP 2.5(a).

The employees' constructive, wrongful discharge suit was timely filed and the trial court properly instructed the jury on the law. Accordingly, we affirm. Moreover, we grant Barnett

No. 41832-1-II

and the Gonzalezes attorney fees on appeal. As the prevailing party in an action to recover wages, they are entitled to attorney fees pursuant to chapter 49.48 RCW and RAP 18.1.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

QUINN-BRINTNALL, P.J.

We concur:

VAN DEREN, J.

PENOYAR, J.

17